STEINER & VOEGTLY HARDWARE CO. v. TABOR SASH CO.

(Circuit Court, D. New Jersey. April 11, 1910.)

1. PATENTS (§ 160*)—CONSTRUCTION—REFERENCE TO DRAWINGS.

The drawings accompanying the specification of a patent and referred to in the descriptive parts thereof will be examined to ascertain the true meaning of the terms used in describing the invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 235; Dec. Dig. § 160.*]

2. PATENTS (§ 72*)—ANTICIPATION—PRIOR PATENTS.

The lack of interchangeability of parts in two combinations is an important factor in determining the question of equivalency or mechanical suggestion, where lack of novelty and invention is claimed because of a prior patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 86–91; Dec. Dig. § 72.*]

3. PATENTS (§ 26*)—INVENTION—NEW COMBINATION OF OLD ELEMENTS.

A new combination of old elements is entitled to the protection of a patent, where it produces a new and useful result, although each old element as seen in a prior device may have been suggestive of the use which could be made of it in the new.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 29; Dec. Dig. § 26.*]

4. PATENTS (§ 136*)—REISSUES—PATENTS SUBJECT OF REISSUE.

It is not necessary that a patent should be wholly inoperative or invalid to justify a reissue; but if it is so broad as to be of doubtful validity, and the defect was due to inadvertence, the patentee is entitled to a reissue to limit his claims to his actual invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 198½; Dec. Dig. § 136.*]

5. PATENTS (§ 138*)—REISSUES—TIME OF MAKING APPLICATION.

Where a reissue narrows the claims of the original patent, mere delay in applying for a reissue does no more than suggest laches, which is negatived where there was nothing on the face of the original patent nor any reference by the Patent Office to charge the patentee with notice that his claims were too broad, and he acted with reasonable diligence when put to inquiry as to whether they were confined to his actual invention; and what is reasonable diligence depends on the particular circumstances of the case.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 201; Dec. Dig. § 138.*

Time for application for reissue, see note to United Blue-Flame Oil Stove Co. v. Glazier, 55 C. C. A. 560.]

6. PATENTS (§ 138*)—REISSUES—VALIDITY—LACHES.

A delay of 12 years before applying for a reissue held not to bar a patentee by laches, where the device manufactured and sold by him was in strict conformity with that shown in his patent, and his exclusive right was acquiesced in by the trade for more than 10 years, and it was only when after that serious infringement commenced that he was put upon notice that his claims were probably invalid as too broad.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 203; Dec. Dig. § 138.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. PATENTS (§ 138\*)—REISSUES—VALIDITY—INTERVENING RIGHTS.

The doctrine of intervening rights cannot be invoked to invalidate a reissue patent by an infringer of the device disclosed by the original patent and protected by the narrower claims of the reissue.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 202; Dec. Dig. § 138.\*]

8. PATENTS (§ 328\*)—REISSUE—VALIDITY AND INFRINGEMENT—WINDOW.

The Giesey reissue patent, No. 12,405 (original No. 488,761), for a window having a centrally-pivoted horizontally-swinging sash, is within the invention disclosed by the original patent, was not barred by laches, and is valid. Also, *held* infringed.

9. PATENTS (§ 16\*)—"INVENTION"—WHAT CONSTITUTES.

That which influences the mental conception, and leads one, step by step, until his device is successfuly produced, is "invention," as distinguished from mere "mechanical skill."

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 16.\*

For other definitions, see Words and Phrases, vol. 4, pp. 3749–3754.]

In Equity. Suit by the Steiner & Voegtly Hardware Company against the Tabor Sash Company. On final hearing. Decree for complainant.

Christy & Christy (Marshall A. Christy, of counsel), for complainant.

Frank S. Katzenbach, Jr. (J. William Ellis, of counsel), for defendant.

RELLSTAB, District Judge. The complainant, as assignee of letters patent reissue No. 12,405 (applied for November 10, 1904), dated November 7, 1905 (original No. 488,761, dated December 27, 1892), and letters patent No. 580,127, dated April 6, 1897, granted to James H. Giesey, for certain new and useful improvements in windows, brings this suit against defendant for an alleged infringement of such patents.

The bill alleges that the improvements covered by said letters patents are capable of use conjointly in one and the same window, and that the defendant has so used them. It contains the usual charges of the making, selling, and using by the defendant of windows that are an infringement of the complainant's patents, and prays the usual remedies of an injunction and an accounting.

The charge of the bill relative to the infringement of patent No. 580,127 was abandoned. The question submitted, therefore, relates entirely to the reissued letters patent No. 12,405, and the charge of infringement is based upon claims 1, 2, and 3 of that patent.

This patented device, adopting the language of the complainant's brief—

"consists of a window which is centrally pivoted within its frame, at the top and bottom, so that it may be rotated about on its pivotal axis, and which is of less height than the frame-space, so that when in its normal closed position it may fit down below the usual stool or strip on the sill, to make a weather-tight closure, and, when it is desired to rotate it on its pivots, it may be elevated so as to clear the stool. In order to close the space which will be left at the top when the window is lowered, and to permit of its being elevated and turned, there is provided a separate follower-strip, which rests upon and moves with the upper rail of the window, closing the top opening

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

when the window is lowered, and being pushed up into a recess provided for it in the top of the frame when the window is elevated.

"The mechanism for elevating the window, and supporting it in its elevated position so as to permit its rotation, is contained in the lower rail of the window. By throwing over a lever the window is elevated above the stool, and supported in that position upon a firm bearing; and it may be rotated through a complete half circle, so as to turn its outer surface within, for purposes of cleaning or any other."

The defendant admits that, if claims 1 and 2 are held to be valid, its two devices, "Complainant's Exhibits Defendant's Windows No. 1 and 2," infringe such claims. It contends, however, that all of the three claims are invalid for the following reasons:

"First, that the reissue as a reissue is void because of laches and intervening rights and because the description in the original specification is insufficient to support the claims of the reissue; second, that the claims in issue are totally lacking in novelty and invention; third, that the defendant does not infringe any valid claims of the patent in issue."

The character of these defenses requires an extended quotation of and reference to the specifications of both patents. They will be combined; the parts of the original omitted from the reissue being bracketed, and the new parts in the reissue being italicized. They are as follows:

"Prior to my invention, so far as I am aware, pivoted windows have been so constructed and normally arranged with reference to the sill that the sash in its rotary movement has always moved in a plane slightly above the plane of the window sill, and consequently a neat or weather-tight joint could not be made. Efforts to overcome this inherent disadvantage have been suggested, consisting in providing the sill with a molding or strip adjacent to that half of the sash which in its rotary movement traveled away from the inside of the sill, but a concomitant disadvantage of this arrangement laid in the fact that the molding or strip formed a check against the rotation of the sash beyond one-half of a complete circle, and consequently great difficulty has been experienced in cleaning the outside surface of the window; and the further disadvantage has existed in the fact that that half of the sill which of necessity was devoid of the molding or strip was in a condition to admit between it and the window sash, wind, dirt, and rain; another disadvantage of the construction referred to lying in the fact that the entire weight of the sash is at all times exerted upon the central lower vertical pivots, and a consequent sagging of the same takes place each side of said pivot to such an extent that the sill is marred and defaced by the rotary movement of the sash. *There has also been suggested, in the type of windows made up of two wings respectively hinged to opposite sides of the frame and opening and closing like a door, an arrangement in which one of the swinging wings is capable of a slight vertical movement on its hinges and is provided with a tension spring which tends to hold it in elevated position. In order to hold the window closed in its lowered position, a lock is provided, which must be engaged with the sill in order to resist and overcome the elevating force which is constantly exerted by the tension of the spring.*

"My invention has for its objects to overcome all these defects and disadvantages [of a pivoted sash, and to secure in such a sash all the advantages which are inherent with an ordinary vertically movable sash; and with these objects and ends in view, my invention consists generically of a vertically pivoted sash so arranged with the frame and sill of a window that it shall have both a vertical movement, by which it may be raised out of and lowered into a seat, and a rotary movement by which it may be revolved to open and close the window, as will be hereinafter more fully explained], *above stated, and to secure in a pivoted sash all the advantages which are inherent in an ordinary vertically-movable sash.*

"[My invention also consists in the peculiar construction and arrangement of the devices employed for securing the results aimed at.]

178 F.—53

"In order that those skilled in the art to which my invention appertains may fully understand the same, I will proceed to describe its construction, arrangement, and mode of operation, referring by letters to the accompanying drawings, in which:

"Figure 1 is a perspective view of a *centrally-pivoted horizontally-swinging* sash and frame embodying my invention. Fig. 2 is a central vertical section. * * * "

The following are the drawings here referred to:

FIG.1.

FIG.2.

" *   *   * Similar letters of reference indicate like parts in the several figures of the drawings.

" 'A' represents an ordinary window frame with the sill, B, provided with a rabbet or seat for the lower rail of the sash, C, as is customary in the construction of windows in which the sash is raised and lowered to open and close the window: this seat or rabbet in the sill being essentially necessary to form a guard against the entrance of wind, dirt, and rain when the window is closed. The sash, C, is swung centrally upon vertical pivots, D, D'. The upper one, D, is formed integral with a rectangular plate, E, and the latter is secured to the frame by screws, A. The lower pivot, D', is formed integral with a plate, E', which plate is secured by screws, b, in a mortise on the under side of the lower rail of the sash, and formed with two longitudinal channels, g, g, to permit of the movement, hereinafter described, of the eccentrics. The sash is made less than the length of the opening in the frame, and consequently, when the lower rail of the sash is properly seated upon the sill or in the rabbet thereof, the upper rail of the sash will be below the under side of the upper part of the frame, and to close the space thus created, I provide an ordinary 'follower,' F, which rests upon the upper rail of the sash and is lifted thereby when the sash is raised, and falls by gravity when the sash is lowered. This follower is mortised out centrally to surround the upper pivot plate, D, when the said follower is lifted, as is clearly shown at Fig. 2.   *   *   *

"Having described the construction and arrangement of the several parts of my improved window, I will now proceed to describe the operation of the same. The window being in a closed condition, and it being desired to open the same, the lever, I, is turned to the right, as indicated by the arrow, until the journal, K, has rotated sufficiently far for the eccentrics to lift the sash free from the rabbet in the sill and for the feet or straight portions of the eccentrics to rest upon the plate, G', during which movement the follower, F, has been lifted up into its pocket or box in the upper portion of the frame, A. The sash may now be freely rotated upon its vertical pivots, D, D', at any angle to the natural plane of the window, and to such an extent that the outside surface of the sash, or glass, is readily accessible from the inside for the purpose of cleaning the same. When it is desired to restore the sash to its closed position, it is rotated in a reverse direction until it reaches its normal plane within the frame, the lever, I, is then thrown back, and the weight of the sash causes it to descend within the rabbet in the sill and to rest with its entire weight throughout its entire width upon the sill, and, as the sash in ordinary use is for a greater portion of the time closed, it will be seen that its own weight operates to keep it in true and stiff condition, thus avoiding the sagging or distortion occurring in pivoted windows as ordinarily constructed.

"[Many variations may be made in the details of construction without departing from the spirit of my invention, the gist or genus of which consists in the broad idea of a pivoted sash so arranged that it can be moved vertically to seat itself within a recess or rabbet in the sill, and to be released from and rotate above such seat.]

"*While I have herein illustrated and described the means which I prefer for carrying out my said invention, it is obvious that other and equivalent means may be employed for that purpose, and I therefore do not limit the scope of my said invention further than as defined in the claims hereto appended.*

"What I claim as new and desire to secure by letters patent is:

"[1. A window sash pivoted within the frame and also movable vertically therein, said sash being of less height than the frame space, and having means for closing the opening between the sash and frame, substantially as described.]

"*1. The combination with a window frame, and a centrally-pivoted horizontally-swinging window sash of less height than the frame-space and movable vertically therein, of means for closing the opening between the sash and frame, and means for positively elevating the sash, substantially as described.*

"[2. A window sash pivoted within the frame, and also movable vertically therein, said window sash being of less height than the frame-space, and a

vertically movable strip for closing the space between the sash and frame, substantially as described.]

"2. *The combination with a window frame of a centrally-pivoted horizontally-swinging window sash of less height than the frame-space and movable vertically therein, and means movable vertically by and with the sash for closing the opening between the sash and frame, substantially as described.*

"[3. A window sash pivoted within the frame and also movable vertically therein, said window sash being of less height than the frame-space and having means for closing the opening between the sash and frame, in combination with means for lifting the sash, substantially as described.]

"[4] 3. A window sash pivoted within the frame and also movable vertically therein, said sash being of less height than the frame-space, and having means for closing the opening between the sash and frame, in combination with a lifting device composed of a lever, rotating journal, and eccentrics substantially as described."

The fifth, sixth, and seventh claims of the original are the same as the fourth, fifth, and sixth claims of the reissue, respectively, and are not involved in these proceedings.

As to the defense that the original specification is insufficient to support the claims of the reissue: Claims 1 and 2 of the reissue take the place of claims 1, 2, and 3 of the original, and the latter are much broader than those of the reissue. The original embrace a window sash pivoted within the frame and movable vertically therein, and unless the concluding phrase to each of such claims, viz., "substantially as described," limits the place of the pivoting, the sash may be pivoted anywhere between the sides of the frame.

The defendant admits that the drawings accompanying the specification show a "centrally-pivoted horizontally-swinging window sash," but insists that the specification does not show that such is the invention intended. This is an error. The inventor intended such a device, but in his claims he did not confine himself thereto. Preliminary to describing his invention, Giesey, in referring to the state of the art and the disadvantages which pivoted windows in their rotary movements then possessed, said:

"That the entire weight of the sash is at all times exerted upon the central lower vertical pivots, and a consequent sagging of the same takes place each side of said pivot to such extent that the sill is marred and defaced by the rotary movement of the sash."

In describing his invention he specifically referred to the accompanying drawings, and thus made them a part of his description. The drawings accompanying the specification and referred to in the descriptive parts thereof will be examined to ascertain the true meaning of the terms used in describing the invention. Rev. St. § 4889 (U. S. Comp. St. 1901, p. 3382); Bates v. Coe, 98 U. S. 31, 38, 25 L. Ed. 68; Card v. Colby, 64 Fed. 594, 12 C. C. A. 319; Brammer v. Schroeder, 106 Fed. 918, 46 C. C. A. 41; Lamb Knit Goods Co. v. Lamb Glove, etc., Co., 120 Fed. 267, 56 C. C. A. 547; Mossberg v. Nutter, 135 Fed. 95, 68 C. C. A. 257; Robins, etc., Co. v. American, etc., Co., 145 Fed. 923, 76 C. C. A. 461.

The inventor, referring to the drawings, said:

"Fig. 1 is a perspective view of a sash and frame embodying my invention. Fig. 2 is a central vertical section."

Both these figures show only a centrally-pivoted horizontally-swinging window sash, and none of the other figures show any other kind of a pivoted sash. He also says, with reference to the letters used with such figures:

"The sash, C, is swung centrally upon vertical pivots, D, D'," etc.

And after describing the construction and arrangement of the several parts of his window, he, with reference to its operation, says:

"The sash may now be freely rotated upon its vertical pivots, D, D', at any angle to the natural plane of the window, and to such an extent that the outside surface of the sash (or glass) is readily accessible from the inside for the purpose of cleaning the same."

The reference to the sagging of the sash on each side of the pivots in pivoted windows as they existed before the Giesey patent, the use of the word "central" in relation to pivots, in reciting the disadvantages theretofore found in such sashes, and in describing the construction and arrangement of the several parts of his improvement and the use of the drawings in explaining the construction and operation of such device, evince that Giesey had a "centrally-pivoted horizontally-swinging window sash" in mind, and that he intended such as his invention. I think any one skilled in this particular art would have been able from this description to construct the device embodied in the claims of the reissue.

As to the defense that the claims of the reissue lack novelty and invention: The defendant does not claim that the complainant's device is not new. It contends that the claims of the reissue are void because they involve the exercise of only mechanical skill. A number of patents are cited, not that the inventions therein disclosed anticipate the patent in suit, but that, with the elements there shown, the evolving of the Giesey window was merely a matter of mechanical selection and not an invention. The only patents of the number referred to, which will be considered, are the Paradise patent, No. 373,413, dated November 15, 1887, the Pihlstrom patent, No. 359,283, dated March 15, 1887, the Sassenhoff patent (German) No. 4,842, dated August 27, 1878, and the Maurer patent, No. 49,426, dated August 15, 1865, as they were the ones specifically discussed by the defendant's counsel, and are illustrative of the principle contended for, and because, if they do not sustain such contention, the others are much less capable of doing so. The Paradise and Pihlstrom windows are both centrally pivoted; the former swinging horizontally, and the latter being capable of being swung either horizontally or vertically, according to the location of the pivots. Neither has a vertical movement; therefore, neither is capable of being lowered below the strip on the sill.

To rotate, these windows must of necessity have a clearance at the top and at the bottom. No provision is made in the Paradise window to prevent dust, wind, and rain from penetrating. The Pihlstrom window is provided with weather strips on sash and frame, but on opposite sides, so constructed that a tight joint would result when the window is closed. The Sassenhoff and Maurer windows are of a casement type, having two wings hinged to the opposite sides of the frame and meeting at the center. Each of these wings is capable of a

vertical movement on the hinge pins. Those of the Sassenhoff can be raised and lowered by the use of an eccentric; those of the Maurer, when unlocked, are raised by a lever mounted upon the side of the frame acting upon one of the hinge members and to which is attached a tension spring, the lower end of which is fastened to the frame, and which exerts a constant pull upwards. In the former the force exerted is to raise the window; in the latter to lower and to lock it. The lower rails of the sashes of the Sassenhoff window are grooved, and when the window is closed they overlap the sill on each side; and the Maurer sashes, when closed, can be lowered to fit below the strip on the sill, and may be kept so by bolts locked into the sill. At the upper edge, the Sassenhoff sash carries a closure strip which overlaps the upper part of the frame in its raised and lowered position and serves as a means for closing the opening between the sash and frame.

Above, and resting on the two wings of the Maurer window, is a single follower-strip connected by a cord attached at its center to the outer end of the lever referred to. This follower is raised by the same lever and spring movements which raise the window wings, and lowers by the same force that is required to lower such wings, and, when lowered, closes the opening between the wings and the top of the frame.

Neither the Sassenhoff nor Maurer sashes rotate through the frame, but swing inwardly and from the frame. The Maurer window, the one principally relied upon by the defendant, is of an entirely different type from the centrally-pivoted Giesey window. It was not placed on the market, and did not obtain a place in the trade. Only one was ever made, and that for use in the patentee's own residence. It is a matter of considerable doubt whether the spring employed in the Maurer device to lift the sash would prove a practical success even in the case of small windows; but certain it is that a spring always under tension would not prove a suitable device to accomplish the purpose of the Giesey invention. That invention, again adopting the language of complainant's counsel—

"finds its useful field in the large, heavy plate glass windows used in modern public, mercantile, and office buildings, which, as appears in the record, run to dimensions as great as 10 feet by 12 feet, and may weigh 500 or 600 pounds. By means of this invention these massive windows may be handled and manipulated as easily as an ordinary sash, and they are at the same time so firmly and efficiently supported as not to be subject to any sagging or derangement which their great weight might well lead to be expected. * * * Obviously, the spring employed by Maurer for elevating his window wing is not adapted for use upon windows of the size and weight found in modern office buildings, the field in which the Giesey window has met with the greatest success.

"A spring heavy enough to elevate a window weighing 500 or 600 pounds would be so bulky that no architect would attempt to use it.

"Being under constant tension, it must necessarily wear out; while at the same time, being inclosed in the frame work of the wall, it would be inaccessible for purposes of renewal or repair."

The lack of interchangeability of the lifting devices, and the means of closing the opening between the sash and frame of these two types of invention is not to be lost sight of. This is an important test in determining the question of infringement. Miller v. Eagle Mfg. Co.,

151 U. S. 186, 208, 14 Sup. Ct. 310, 38 L. Ed. 121; Pittsburgh Meter Co. v. Pittsburgh Supply Co., 109 Fed. 644, 651, 48 C. C. A. 580; Eames v. Worcester Polytechnic Institute, 123 Fed. 67, 72, 60 C. C. A. 37. And it must be an influential factor in determining the question of equivalency or mechanical suggestion.

The Giesey lifting device could not be used with the Maurer window, as it finds its support in the sill; for if it were so used the Maurer window would fall as soon as it was swung open, and before it could be closed it would have to be raised by hand; and, as already noted, the Maurer spring is not adapted to raise the large and heavy Giesey window, for, while the force of the tension spring is not an impossible lifting device, it would soon become impracticable. The tensile power of such a device would lessen from the very beginning of its use, and would soon prove abortive.

Such a lifting device is not an equivalent "means for positively elevating a sash," specified in claim 1 of the patent in suit and described in the specification. Neither are the follower-strips of the two windows interchangeable to close the opening between the sash and the frame. That of Maurer is raised and held in position by the tension spring which raises the window sash; that of Giesey raises and falls with the sash. If the Giesey follower should be used with the Maurer window, and the window should be swung through its whole half circle, the follower would drop for lack of support, and would have to be raised by hand before the window could be closed.

It is true that the patent in suit utilizes old elements. The central pivot and horizontal rotation is shown by the Paradise and Pihlstrom patents; the raising of the sash above the sill to enable it to swing free and clear of the stool of the sill, by the Sassenhoff and Maurer patents. The latter also shows the use of a follower-strip to close the space between the top rail of the sash and the frame.

But the use of the old elements does not prevent the possibility of invention. It is perfectly well settled that a new combination of elements old in themselves, but which produces a new and useful result, entitles the inventor to the protection of a patent. Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 Sup. Ct. 652, 53 L. Ed. 1034.

Whether such invention would be great or small is immaterial. The question always and exclusively is: Does this combination, with its necessary result, show invention? Undoubtedly the field in which the Giesey device belongs was considerably narrowed by the patents referred to. But none of these produced a window improvement which anticipated the patent in suit. They were all of record several years (the Maurer more than a quarter of a century) before the original Giesey patent was applied for. No citation of any of these patents was made by the Patent Office pending the Giesey application; and no one skilled in this particular art had produced a device even approximating the Giesey window. It is very easy now, since the Giesey patent was issued, to see the relation that this device bears to the earlier devices. But in dealing with this question the mind must go back to a time anterior to the Giesey application, and see whether at that time, in the light of these earlier patents and the state of the art

as it then was, these elements distributed among these earlier devices would suggest the Giesey device to one ordinarily skilled in that particular art.

The defendant further contends that the shifting of the hinge from the side of the Maurer window frame to the center so as to act as a central pivot, and which would occur to an ordinarily skilled mechanic, would alone be necessary to produce a window which would possess all the mechanical equivalents of the Giesey window.

Two models, "Defendant's Exhibit Model No. 1," showing the Maurer device as patented, and "Defendant's Exhibit Model No. 6," showing the change of such device to a centrally-pivoted sash, were introduced in evidence by the defendant to show this equivalency. The argument based on these earlier patents only confuses the mental conception which resulted in invention, with the means which gave it practical form. As was said by Justice Clifford in Bates v. Coe, 98 U. S. 31, at page 48 (25 L. Ed. 68):

"Where the thing patented is an entirety, consisting of a single device or combination of old elements, incapable of division or separate use, the respondent cannot escape the charge of infringement by alleging or proving that a part of the entire thing is found in one prior patent or printed publication or machine, and another part in another prior exhibit, and still another part in a third one, and from the three or any greater number of such exhibits draw the conclusion that the patentee is not the original and first inventor of the patented improvement."

And by Judge Taft in Columbus Watch Co. v. Robbins, 64 Fed. 384, at page 393, 12 C. C. A. 174, at page 183:

"No patent, of all those which we have had occasion to examine, shows the combination of elements just recited. It is said that the Church patent is nothing but a combination of the Wheeler patent with the Colby stem arbor, which any mechanic of skill could have arranged for practical operation. Drawings and a model have been submitted showing how easy it is to unite the Colby stem arbor with the Wheeler patent. In our view, this is but wisdom after the fact. We cannot concur in the view that, even if it were known that a combination of the Wheeler patent with the Colby stem arbor would have an advantageous result, mere mechanical skill would enable one to make the combination. The combination shown in the drawings and model is a combination suggested by the Church patent, and which, but for the Church patent, would seem more difficult than it now does. More than this, it involved patentable invention to see that a union of the elements of the Wheeler patent with those of the Colby patent would have a beneficial result."

To same effect, see Thomson-Houston Elect. Co. v. Black River Traction Co., 135 Fed. 759, 764, 68 C. C. A. 461.

The complainant's device was not produced by a mere selection and adjustment of the several elements embodied in the Maurer, or any of the other devices taken singly or together. The Giesey window was the product of the mind and not of these devices. The means employed in making the conception a reality, and in such form as to make it practical and useful, were old. Each element was suggestive of the use that could be made of it; but there the mechanical suggestiveness ended. The gist of Giesey's invention lay in the conception of so constructing a single centrally-pivoted horizontally-rotating window sash, normally resting by its own weight on the sill behind the stool thereof, and so combining with its frame as to be weather-tight

and capable of being elevated in the frame to clear its seat and then rotated about on its pivot to any angle desired; its weight while elevated resting on the lifting device which has its base on the sill. Such a device with such an operation and results had never been made before. Giesey conceived it. His device met with instant success. It supplied a recognized trade want. This not only evidences its utility, but that it was not an obvious evolution from the earlier patents. In my opinion, that which influenced the mental conception, and led Giesey step by step till his device was successfully produced, was "invention" as distinguished from mere "mechanical skill."

As to the defense that the reissue is not for the same invention: The specification and claims of the original patent were not limited to a "centrally-pivoted horizontally-swinging sash." They broadly claim "a window sash pivoted within the frame and also movable vertically therein." It was this breadth of claim in view of the Maurer patent that induced Giesey to apply for a reissue. The complainant says this reissue was to correct the original specification by abandoning what was old, and to limit the scope of the patent to the actual invention disclosed and described therein. The defendant contends that the claims of the reissue attempt to cover a previously unrecognized invention; and that they describe an independent invention, if it be an invention.

As to reissues, the act of Congress provides (Rev. St. § 4916 [U. S. Comp. St. 1901, p. 3393]):

"Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident or mistake, and without any fraudulent or deceptive intention, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee * * * for the unexpired part of the term of the original patent."

The specification and claims are undoubtedly broader than the invention disclosed. If the Maurer window was "within the frame," it was included in the Giesey claims. The patent was granted without any suggestion from the Patent Office of the existence of the Maurer device. Had it been called to Giesey's attention, a correction of this specification and claims could then have been made. Within specified limitations, that which may be done by amendment in the Patent Office pending the application may be done after the patent is granted, by a reissue. It is not necessary that the patent should be wholly inoperative or invalid to justify a reissue. As was said in Hobbs v. Beach, 180 U. S. 383, 394, 21 Sup. Ct. 409, 414 (45 L. Ed. 586):

"Possibly the error was such as would not have impaired the patentee's rights under his original designs; but he was entitled to the full scope of his invention, and if he were dissatisfied with the drawings as they stood, and the error was purely an inadvertent one, we think it was within the jurisdiction of the Commissioner of Patents to order the patent to be reissued."

Assuming that the existence of the Maurer patent made the Giesey patent of doubtful validity, is the reissue within the statutory restric-

tions? There is nothing in the record that suggests that this defect in the Giesey patent was not occasioned inadvertently, or that it was due to a fraudulent or deceptive intent.

Was it for the same invention? The device actually made and marketed is the same. The defendant admittedly infringed the invention disclosed in the drawings annexed to the original specifications. The claims of the reissue are narrower than those of the original patent, and were drawn so as to confine the claims to the specific invention disclosed in the original. No addition to, or change in, the drawings were made, and such new or substituted parts in the reissued specification in no way change the device originally described and patented. This is not the case of the securing of a reissue to broaden the claims so as to cover a device not covered in the original. The defendant is not charged with infringement of a device not embraced within the original specification, and the reissue was not sought to so enlarge the invention as to furnish the basis to sustain such a charge. Having reached the conclusion that the description contained in the original specification is sufficient to support the claims of the reissue, I think that only a comparison of the two patents is necessary to convince that the claims of the reissue do not point out a new invention, but, by eliminating the broad features of the original patent, confine the invention to the one disclosed in the original.

As to the defense of laches and intervening rights: More than 12 years elapsed between the original grant and the application for reissue. The patent statute does not employ the term "laches." Delay of application which bars a patent is abandonment under section 4886. Macomber, Fixed Law of Patents, § 726, p. 668. The defense of laches being negative does not appeal strongly to the courts, where the reissue narrows the claims. In such cases mere delay in applying for a reissue, even for a long period, does no more than suggest laches. There being nothing on the face of the original patent to charge the patentee with notice that his claims were too broad, proof that the patentee acted with reasonable diligence when he was put to the inquiry whether his claims were confined to the actual invention is sufficient to negative laches. Mahn v. Harwood, 112 U. S. 354, 5 Sup. Ct. 174, 6 Sup. Ct. 451, 28 L. Ed. 665.

What is reasonable diligence depends on the particular circumstances of the case considered. The Patent Office had granted Giesey's claims without question, and the presumption of the validity was in his favor. The device manufactured and sold by him was in strict conformity with that shown in his patent; and his exclusive right thereto was acquiesced in by the trade for more than 10 years. Until the infringement by the defendant, no serious interference with his rights was manifested, and such infringements as preceded that of the defendant's ceased promptly after the infringers were notified. It was only after the later infringers, including the defendant, refused to cease upon notification, and in the preparation for a legal contest, that the patentee was put upon notice of the probable invalidity of his patent, for having claimed a broader invention than he was entitled to. Thereupon he applied promptly for a reissue to narrow and restrict his claims.

· Neither the defendant nor any other member of the public obtained any rights by infringing the device disclosed in the original patent, and which is protected by the reissue. The doctrine of intervening rights cannot be invoked in such a case. The defendant does not stand in the position of one who uses a device which is outside of the invention described and claimed in the original specification, and which can only be made an infringing device by broadening or expanding the claims of the reissue, or which, though disclosed in the specification or drawings, may be said to have been abandoned by the inventor or dedicated to the public. One of the purposes of the grant of a reissue is to afford protection to an inventor who has claimed more than he had a right to; and this protection dates back to the time of the original issue as against those who infringed the invention therein disclosed. The cases cited by the defendant are not opposed to this view. These, other than Pelzer v. Meyberg (C. C.) 97 Fed. 969, relate to reissues where the claims enlarge the invention as originally patented, or cover a different invention, or where the patentee, after having been put upon his inquiry whether his claims were of doubtful validity, elects to stand thereon for a time which the courts hold, under the circumstances, to be unreasonable. Pelzer v. Meyberg was decided on demurrer. The bill made no excuse whatever for the delay. This was considered fatal, but complainant was permitted to amend.

This finding of invention and validity of the reissue applies to all three claims; but the admission of infringement relates only to the first and second claims. The third claim is both broader and narrower than the other two; it covers any window pivoted within the frame, moving vertically therein, and is limited to a lifting device composed of specific elements.

In view of the expiration of the patent in suit (since the argument), and that complete relief may be afforded the complainant on the first two claims, it is deemed unnecessary to consider whether the third claim was infringed.

The prayer of the complainant, except as to the injunction, is granted.