CROWN CORK & SEAL CO., Inc., v. FERDINAND GUTMANN & CO.

No. 7371.

District Court, E. D. New York.

March 2, 1936.

Gifford, Scull & Burgess, of New York City (George F. Scull, of New York City, and John J. Darby, of Washington, D. C., of counsel), for plaintiff.

Hauff & Warland, of New York City (William E. Warland, Francis H. Warland, and N. L. Leek, all of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is an action in equity in which plaintiff seeks relief by injunction and damages for the alleged infringement of the six following patents, for center spot crowns for bottles, and methods of making such spot crowns, to wit:

(1) Patent No. 1,339,066, issued to Charles E. McManus, for bottle-closure, dated May 4, 1920, on an application filed November 17, 1915; (2) patent No. 1,899,782, issued to Albin H. Warth, assignor to Crown Cork & Seal Company, Inc., for material for facing bottle caps and method of making same, dated February 28, 1933, on an application filed December 17, 1929; (3) patent No. 1,899,783, issued to Albin H. Warth, assignor to Crown Cork & Seal Company, Inc., for bottle cap and method of manufacturing same, dated February 28, 1933, on an application filed May 5, 1929, divided and this application filed October 31, 1930; (4) reissue patent No. 19,117, issued to Albin H. Warth, assignor, by mesne assignments, to Crown Cork & Seal Company, Inc., for process of producing closures, dated March 20, 1934. Original No. 1,788,260, dated January 6, 1931, serial No. 159,743, January 7, 1927. Application for reissue January 23, 1934; (5) patent No. 1,956,481, issued to Albin H. Warth, assignor to Crown Cork & Seal Company, Inc., for spot crown and liner material therefor, dated April 24, 1934, on an application filed June 16, 1933; (6) patent No. 1,967,195, issued to Albin H. Warth, assignor to Crown Cork & Seal Company, Inc., for method of manufacturing bottle caps, dated July 17, 1934, on original application November 7, 1930, serial No. 494,201, which in turn is a division of serial No. 159,743, January 7, 1927, now patent No. 1,788,260, dated January 6, 1931. Divided and this application filed April 4, 1933.

The general defenses of the defendant are: Invalidity of all of the patents over the prior art, laches and estoppel on the part of the plaintiff as to one of the patents, noninfringement, lack of title to two of the patents in suit, owing to collusion in interference proceedings in the patent office, in which interference priority was purported to have been found in favor of the patentee Warth, prior use by the defendant and others as to some of the patents, prior use by the plaintiff as to some of the patents, the plaintiff has not come into equity with clean hands, for the reason that it has suppressed evidence in the patent office in some of the interferences and applications, and also attempted to suppress evidence of other material facts. Defendant has also counterclaimed against the plaintiff alleging infringement of patent No. 1,921,808, issued to Benno Cohn, assignor to Ferdinand Gutmann & Co., for method of making closures, dated August 8, 1933, on an application filed July 20, 1932, the title to which patent is now in the defendant.

The plaintiff is a New York corporation with its principal factory at Baltimore, Md.

The defendant is a New York corporation with its factory in Brooklyn, N. Y.

Plaintiff's title to all of the said patents, except McManus' No. 1,339,066, is stipulated.

As to the McManus patent No. 1,339,066, plaintiff is the owner, and takes its title in the following manner:

Plaintiff was formed by a consolidation of New Process Cork Company and New York Improved Patents Corporation, each a corporation of the state of New York. The McManus patent in suit was assigned by McManus, to whom the patent issued, to Cem Securities Corporation, which corporation granted an exclusive license under that as well as other patents to New

Process Cork Company. The Cem Securities Corporation assigned the entire right, title, and interest of the McManus patent in suit, together with other patents, to the plaintiff. No formal instrument transferring to plaintiff the exclusive license granted to the New Process Cork Company was shown, but since the New Process Cork Company was one of the merging companies from which plaintiff was formed, obviously, the exclusive license was thus carried to plaintiff, thus vesting in plaintiff both the legal title and any outstanding exclusive license.

The crown cap to which the center spot of the patents in suit is applied has a thin metal shell with corrugated skirts, adapted to be pressed into engagement with a lip on the bottle, to hold the cap tightly in place. Inside the cap is a disc of cork, either natural cork or composition cork, the latter being made up of small particles held together by a binder. Without something on the disc, the liquid contents of the bottle come directly into contact with the cork disc. This has created a problem as to certain beverages, which has been solved by the center spots.

The desirability of covering the cork closure with some material which would prevent contact between the beverage and the cork was appreciated by the art for a long time. Where the bottle contents are not under gas pressure, this can be done by the "overall" form of closure, in which a sheet of paper or foil covers the entire surface of the cushion disc, but as this interposes the paper or foil between the entire bottle neck and the cushion disc, it is not suitable for pressure beverages. The cushion discs in such overall crowns are cut out of a composite sheet of cork or pulp board, which has previously been faced with the facing material.

For high pressure beverages which are to be held for a long time without leaking or breaking down, the center spot is designed, and it is particularly desirable for beverages having a national distribution from one or more bottling points, and to enable the use of relatively cheap composition cork discs. The facing material is applied to the cork discs, so that the cork can still function as a seal against the mouth of the bottle while, at the same time, the periphery of the center spot is also engaged by the neck of the bottle to prevent, so far as possible, the liquid in the bottle from reaching the cork disc of the closure.

The center spot crown illustrated on Exhibit 17 may be of paper or metal foil, and is large enough to extend part way over the lip of the bottle mouth, leaving a considerable area of the lip to be contacted by the cork disc itself which forms the pressure holding seal, while the center spot keeps the beverage from contacting with the cork. Before being applied to the bottle, the center spot lies flat on the surface of the cork, but when the crown is placed on the bottle under very heavy pressure, the cork adjacent to the periphery of the shell is highly compressed, resulting in a deformation of the center spot, which subjects the center spot to a considerable stretching pressure, and the spot material must be strong enough to withstand it.

It is essential for pressure beverages that the spot be accurately centered on the cork disc. If it is not, a part of the center spot may extend over the entire surface of the neck of the bottle at one side, and thus permit leaking and, at the other side, it would be pulled away from the neck of the bottle, and thus permit the bottle contents to contact with the cork.

To prevent complaints as to the results of the bottling, either on the part of the bottler or consumer, the center spot crowns must be substantially perfect as the caps are applied to the bottles at a rate of speed as high as 160 a minute, and the bottler has no time to inspect each center spot crown to make sure that it is satisfactory.

Both to stand shipment and because of the conditions obtaining in the bottle capping machine itself, it is essential that the spots be very tightly affixed to the discs.

To meet the competition with other forms of corking, the spot crowns must be made cheaply, and to do this the spots must be accurately and positively placed in position, at a high rate of speed, and with a minimum number of "rejects" requiring subsequent operations.

A tremendous amount of spot crowns are made and sold today, at from 22 to 24 cents a gross, which includes the entire crown, consisting of the shell with its ornamental printing, the composition cork disc, and the center spot.

By the methods of the patents in suit, plaintiff is now applying these spots to crowns at the rate of 500 per minute for each operating unit, and its sales at the annual rate of about 9,000,000 gross of center spot crowns constituting about 30 per cent. of its entire crown production.

Plaintiff has some fifteen licensees under the patents in suit, who are also producing center spot crowns, and adding defendant's output, the total annual output of center spot crowns is of very large proportions.

The first patent in suit is the McManus patent No. 1,339,066, of which claims 3 and 8, reading as follows, are in suit:

Claim 3:

"3. A bottle closure embodying therein a metallic cap, a compressible disc within said cap, and a flexible disc of non-absorbent material superimposed upon and united by means of a fusible binding medium with, said compressible disc, said superimposed disc being of smaller diameter than said compressible disc, whereby a sufficient portion of the surface of said compressible disc is exposed, to permit the sealing of the bottle directly against said compressible disc and the portion of the compressible disc within the neck of the bottle is protected by said flexible disc."

Claim 8:

"8. A bottle closure embodying therein a metallic cap, a compressible disc secured within said cap by means of a fusible binding medium, and a flexible disc of non-absorbent material superimposed upon, and united by means of a fusible binding medium with, said compressible disc, said superimposed disc being of smaller diameter than said compressible disc, whereby a sufficient portion of the surface of said compressible disc is exposed to permit the sealing of the bottle directly against said compressible disc and the portion of the compressible disc within the neck of the bottle is protected by said flexible disc."

This patent describes the center spot substantially as I have hereinbefore described it.

The patentee in his specification showed his knowledge of what is required in a center spot, and disclosed various ways to make such a center spot.

At page 2, commencing at line 75 of the patent, McManus describes the attachment of the flexible disc (center spot) to the compressible disc (cork disc), either by the binding medium used to bind the granules of the composition disc, or by the kind of binding medium used to hold the disc to the cap shell.

At the time of the filing of the application, the material used to hold the disc in the cap was a gum and resin combination.

This was a thermoplastic cement; that is, one which becomes tacky when heated so that, when it is pressed into contact with a surface, it will adhere thereto when the cement cools.

At page 2, lines 81–84, McManus says: "By using this bond, the disc e and the disc f may be assembled in relation to the cap and to each other by one and the same operation if desired."

With the exception of the so-called "White Rock" center spot, there is universally used, as the adhesive for attaching the center spot, a heat fusible, one such as gutta percha or a thermoplastic nitrocellulose-resin combination, which is one of the elements of the claims 3 and 8 in suit. The fusible binding medium has displaced the water soluble adhesives and the heat-set adhesives, the use of which was previously attempted by others in what proved to be commercial failures.

Center spot caps adhered by a heat-fusible cement were not commercialized by McManus because the particular thermoplastic used by him, consisting of copal and rosin, with a little wax to soften it, was rather brittle, and he attempted in his commercial production to use a water soluble adhesive, but the limitations of this adhesive in his commercial production rendered it unsuccessful.

■ The fact still remains that McManus was the first to perceive and disclose to the world the use of a heat-fusible cement, to stick the center spot to the cork, and it is immaterial that neither the plaintiff nor defendant uses the particular kind of thermoplastic bond that McManus gave as an illustration. E. I. Du Pont De Nemours & Co. v. Glidden Co. (C.C.A.) 67 F.(2d) 392, 393.

■ The defendant has offered in evidence as the alleged prior art thirteen patents, the showing of which was not explained on the trial, but they have been discussed by the counsel for the respective parties in their briefs, and I will briefly consider the same.

French patent No. 415,794, to Societe American Cork & Seal Company, published October 4, 1910, shows the so-called "American" form of a crown illustrated on chart 17, in which the cushion was a rubber ring, and the center member analogous to a center spot, was a cup-shaped piece of foil with the cup extending over the ring to hold the latter in place. The spot was

not adhered to the cushion disc, but was soldered to the metal shell where the two metals were in contact, and solder obviously would not be useful in adhering a spot to a cork disc.

French patent No. 463,971, to Montaner & Co., published March 10, 1914, shows a plain tin center spot on a cork disc, which is to be fastened to the cork by being "stamped or pasted," without further suggestion as to how this "stamping" or "pasting" is to be done, and, in particular, what kind of "paste" is to be used.

British patent No. 16,075, A. D. 1913, to Ernest Frederic Edouard DeMuth, accepted July 9, 1914, shows a metal foil center spot adhered to the cushion disc "by cementing or in any other appropriate manner." There is no suggestion as to how this cementing is to be done, or what kind of cement is to be used.

British patent No. 26,297, A. D. 1909, to John MacCormack and David Eglin McPhun, accepted November 10, 1910, shows a disc A of wood pulp, the drawing showing the wood pulp disc contacting with the bottle top, but with the tinfoil disc B no larger than the interior of the neck of the bottle. Such a construction experience has shown to be wholly inoperative. The patent also contains the general statement that the tinfoil is to be coated with some "adhesive substance," without any specification of the kind of adhesive to be used.

Patent No. 1,199,026, to John Alberti, granted September 19, 1916, shows a bottle-closure with a center spot crown. This is the nearest reference to the patent in suit. It taught the use of a wet-heat-set adhesive (albumen), which is not now in use, but did not even suggest the use of a thermoplastic to adhere the spot to the cork. The heat-set adhesive of Alberti was the reverse of the heat-fusible adhesive of the patent in suit, which latter adhesive has proved to be the solution as is shown by its present day universal use. The sample center spot crowns made by Alberti, produced from the files of the patent office, which were filed in connection with his application for patent, do not prove that the wet-heat-set crowns were commercially practical, because, as Alberti says, they were made partially by hand, which, done slowly and carefully, can be accomplished with almost any kind of adhesive.

Patent No. 903,865, to John A. Jones, granted November 17, 1908, shows a method for making composition cork discs by the use of a solution of pure rubber. It discloses no center spot.

Patent No. 1,110,138, to John A. Jones, granted September 8, 1914, shows an ordinary crown cap in which a cork composition is held in the shell. It discloses no center spot nor any kind of covering for the disc.

Patent No. 993,288, to Leonard Bartlett, granted May 23, 1911, shows a machine for making a crown of the type which uses a ring instead of a disc, and leaves no resilient member in the center. In the center of the crown metal foil was used which was cupped and flanged so that the center could be adhered to the crown, and the flanges could be used to hold the rubber ring in place. The rubber ring took the place of the cork, but was not itself adhered to the metal shell. The so-called center spot was used as a means to hold the rubber ring in the shell and at the same time protect the rubber ring from the contents of the bottle. The so-called center spot was held to the shell by solder.

Patent No. 1,195,392, to George M. C. Nielsen, granted August 22, 1916, shows an elaborate machine for the manufacture of the so-called "White Rock" or "Stewart" center spot crown, and in Figs. 13 and 15 the crown itself. The spot is a circular piece of metal foil, having its edges turned up to form a cup, and the edges inserted into a circular slit cut in the cork, thus holding the spot mechanically and not adhesively to the cork. The necessity for using in this type of spot crown natural cork and not a composition cork disc adds greatly to the expense and prevents general competition with the crowns of the patent in suit. As the spot must be of metal foil, and cannot be of paper, its field is restricted, as metal foils cannot be used with acidulated beverages, like dry ginger ale. It is used substantially by one company only.

This was the only commercial spot crown prior to that of the McManus patent in suit, and has been used by the White Rock Company since 1914.

Patent No. 1,129,578, to George F. Knox, granted February 23, 1915, shows a better seal for the ordinary crown cap, to accomplish which the patentee proposed having the bottles specially made with a circular groove in the top into which the cork would be pressed. He also provides a pliable facing sheet, which may be of tin-

foil and is of a diameter approaching that of the cork disc. He expects the swelling of the cork to break the spot when applied to his specially shaped bottle top. Fig. 3 shows a special form in which there are a series of perforations to hasten this breaking. No reference is made to any adhesion of the covering to the cork, and none is needed because he has lapped the covering material around the edges of the cork disc, as shown in Fig. 2.

Patent No. 408,177, to Daniel W. Johnson, granted July 30, 1889; patent No. 957,064, to Charles R. Keeran, granted May 3, 1910; and patent No. 796,356, to Frederick Recht, granted August 1, 1905, all of these three patents being referred to only as showing the state of the art. Each of these patents shows a cap of an overall form, the cushion disc of which has its entire face covered with the protecting material which, rather than the cushion disc itself, really forms the seal. This cap is not satisfactory for pressure bottling. No adhesive is mentioned, the obvious intent being that the protecting material shall be merely laid on the surface of the cushion disc. Reference is made to "wax," but it is to be used to seal the protecting disc to the mouth of the jar rather than to the cushion disc. No center spots are shown in any of the patents. None of the patents of the prior art anticipates the patent in suit.

From all the evidence it seems quite clear to me that neither gutta percha nor any thermoplastic or heat-fusible adhesive was used by the plaintiff or any one prior to 1917, and this is not overcome by the testimony of Smith in the interference proceeding, given entirely from recollection, and as to date given by him, about 1914, he then said, "I am not sure what it was in 1914."

From my examination of the prior art, it appears that what McManus did was much greater than a mere change of the adhesive, in fact it was the solving of a real problem which practical men in the art had tried and failed to solve, and the turning of failure to success by means not even suggested by the prior art.

This I believe constituted invention and the McManus patent in suit is valid.

I do not agree with the defendant's contention that the McManus patent is limited to parchment paper. Foil was at the time of the filing of the McManus application a well-known equivalent for paper in the manufacture of spot caps of other construction, and while claim 2 of the patent in suit limits the spot to papers, claims 3 and 8, which are here in suit, are not so limited but require a disc of nonabsorbent material.

In claim 3 of the patent in suit, a center spot crown is described, the novel feature of which is a fusible binding medium for adhering the spot to the cork disc, and in claim 8 there is described a center spot crown in which a fusible binding medium is used to hold the spot to the disc, and to hold the disc in the shell of the crown.

The stipulated crowns, representative of those made by the defendant, Exhibits 6, 7, and 8, use gutta percha to adhere the spot to the cork disc, and this is heat-fusible. In defendant's caps, Exhibits 4 and 5, an adhesive known as No. 4620 duPont is used, which is also heat-fusible. These caps infringe claim 3 of the McManus patent in suit.

In defendant's caps, Exhibits 4 and 8, the disc is attached to the shell by a fusible binding medium, and infringe claim 8 of the McManus patent in suit.

In 1927, the patentee McManus acquired control of the plaintiff, of which the Crown Cork & Seal Company was a predecessor, and defendant contends that because there is nothing to show that McManus sued the Crown Cork & Seal Company for its infringement of his patent, plaintiff is guilty of such laches against defendant that neither an injunction nor any accounting should be granted. This contention is not sustained. Except for its abandoned experiment of January, 1925, defendant did not manufacture an infringing crown until late in 1928. McManus was engaged in litigation with the International Cork Company until 1926, when he acquired it. McManus had been a stockholder in the Crown Cork & Seal Company from 1922, during which time he had been endeavoring to acquire control of the company.

It does not seem to me that defendant can justify its infringement which commenced years later by the fact that McManus merged his company with Crown Cork & Seal Company instead of indulging in expensive litigation with it while he was engaged in patent litigation with another company. There is no evidence that defendant was misled by the conduct of McManus.

There is no evidence that it came to the attention of McManus that the other companies mentioned by plaintiff's witnesses were infringing, or its extent, but in any event, most of the companies mentioned accepted licenses under the McManus and other patents, as soon as the patent was called to their attention, and are paying royalties today.

The cases of Dwight & Lloyd Sintering Co. v. Greenawalt (C.C.A.) 27 F.(2d) 823, Banker v. Ford Motor Co. (C.C.A.) 69 F. (2d) 665, and Westinghouse Electric & Mfg. Co. v. Jeffrey-De Witt Insulator Co. (C.C.A.) 22 F.(2d) 277, are clearly distinguishable, as in none of them was it contended that there was any question of laches raised, because of the relationship of the plaintiff to other infringers than defendant.

■ The defendant also contends that the plaintiff is estopped from maintaining any suit against it based upon certain correspondence between the parties, and the assertion that plaintiff knew, in 1928, of defendant's infringement. This contention is not sustained. I find no reference in either letter as to patents, nor do I find any evidence to support defendant's assertion that plaintiff knew of defendant's infringement in 1928. The offer of plaintiff to sell to defendant, like other crown manufacturers, various kinds of cork discs, does not show any knowledgement of the fact of defendant's infringement or its extent. The letter of 1930 did not induce defendant to undertake the manufacture of infringing crowns for Goetz, whom it had been selling since 1928, or for any one else.

While I well understand that each case involving the defense of laches and estoppel must be decided on its own facts, it seems to me that applying the general rules laid down in Benthall Mach. Co. v. National Mach. Corporation (D.C.) 222 F. 918, 922; Simpson v. Newport News Shipbuilding Co. (D.C.) 18 F.(2d) 318; Mills Novelty Co. v. Monarch Tool & Mfg. Co. (C.C.A.) 49 F.(2d) 28, 30; and Walker on Patents (6th Ed.) Vol. 1, p. 726, cited by plaintiff, the defendant cannot succeed in that defense.

There is no proof in the case at bar that defendant, to its disadvantage, relied upon any act or lack of action of the plaintiff, or that defendant, during the period in question, changed its position, or that its actions were based upon an assumption that plaintiff did not intend to enforce its patent rights. It is not shown that plaintiff had knowledge of defendant's infringement prior to 1933.

The McManus patent No. 1,339,066, as to the claims in suit, is valid and infringed.

■ The second patent in suit is the Warth patent No. 1,899,782, of which claims 7 and 9, reading as follows, are in suit:

Claim 7: "7. As a new article of manufacture, laminated bottle cap spotting material in strip form comprising hard, tough paper having relatively low absorptive properties, a coating of resistant varnish on one surface of the paper and bonded to the other surface a coating of gutta percha."

Claim 9: "9. As a new article of manufacture, highly flexible material in sheet or strip form for the spotting of cushion discs of caps with center spots of less diameter than the disc diameter consisting of a continuous layer of metallic foil coated on one side with an exposed continuous layer of waterproof, flexible, and acid resistant adhesive adherent to the foil and adapted to adhere to a cork disc, said adhesive being substantially non-tacky at room temperature but fusible upon the application of heat and substantially impervious to moisture whereby spots may be punched from the strip and united to the cushion discs of caps by the mere application of heat and pressure."

Claim 7 is limited to a laminated bottle cap spotting material of hard, tough paper in strip form, with a coating of resistant varnish on one surface, and a coating of gutta percha on the other. Claim 9 is for a strip of bottle cap spotting material consisting of a metal foil coated on one side with a thermoplastic adhesive.

The claims in suit are for the strip as a new article of manufacture, and not for the machine or method of manufacture.

Briefly described, the patent shows a strip of paper, or other material, drawn between a series of rollers, and thereby one side of the material is coated with a coat of gutta percha. This gutta percha material is fed through a cap-assembling machine, and spots of the size required for center spot crowns are punched from this material, and the gutta percha center spots are secured to the cork lining of a cap by means of heat and pressure, causing the gutta percha to adhere to the cork or composition cork lining.

The plaintiff uses these strips in connection with the Warth method of the patents in suit, to make paper spots and metal foil spots, respectively.

The defendant has offered in evidence as the alleged prior art, which were not explained on the trial but were discussed by the counsel for the respective parties in their briefs, the following patents:

Patent No. 1,213,926, to Charles E. McManus, granted January 30, 1917, a strip of tinfoil having a layer of paper, the exposed side of which was "gummed," and the other side bonded to the metal foil by some binding medium such as sodium silicate. The spotting strip of McManus was formed of two layers of material bonded to each other, the face of the paper being covered with a water-soluble adhesive, the gum being described as permitting the application of the material of the strip to a cork by dampening the cork itself.

Patent No. 1,638,541, to Charles E. McManus, shows a strip material to be used for "overall" discs to be placed in metal shells. The strip is made up of a layer of rubber to which is adhered a layer of paper having a cement binder to which another layer of paper is adhered. Discs are cut from this composite strip to be used instead of cork discs for bottle closures. This is not center spot material.

Patent No. 1,657,802, to Louvern G. Lange, granted January 31, 1928, shows a sheet of paper with one face coated with a water-soluble gum, and the other side coated with a quick-drying oil varnish. The cement of the sheet having been dried, it is run through water to wet the adhesive, and the dampened sheet is then pressed into contact with the pulp board to form a composite sheet from which the desired discs can be cut simultaneously across the entire width of the composite sheet. Discs for shells for jars for preserves, mayonnaise, mustard, and the like can be punched from the composite strip material.

Patent No. 1,758,610, to Louvern G. Lange, granted May 13, 1930, contained but a single claim, which was granted to Warth as a result of interference No. 60,-878, and is now claim 3 of the Warth patent in suit, No. 1,899,782.

In 1927, Warth built a combining machine by which strips of spotting material could have a thermoplastic adhesive combined with it, and had used the machine for combining metal foil with gutta percha.

The combined strip was first used in making the experimental lots of Warth paper spot crowns sent to Burroughs Bros., in April, 1927, and Macomber, in August, 1927. Lange's earliest date is his filing date of July 3, 1929.

Patent No. 983,319, to Smith, granted February 7, 1911, shows an overall type of closure, the sealing pad of which has a sheet of Manila paper adhered to it, which paper is coated with a layer of cellulose varnish, and adhered to the pad by a water-soluble glue but not a thermoplastic.

Patent No. 1,238,156, to Reinhold Gustav Koch, granted August 28, 1917, shows an overall covering for a cork pad, the metal foil layer F being adhered to a paper covering by the vulcanized rubber E, the paper D, which is tough but absorbent, being adhered to the face of the cork a by the gutta percha C, and the cork a being adhered to the shell or cap A by a mixture of tartaric acid gum arabic and rosin, which by the application of heat sticks the cork disc to the cap.

Patent No. 1,358,834, to Frederick W. Farrell, granted November 18, 1920, shows a strip of paper coated with Trinidad asphalt, adapted to be used for sealing cartons.

Patent No. 408,177, to Daniel W. Johnson, granted July 30, 1889, which is referred to only as showing the state of the art, shows an overall sealing gasket in which a layer of parchment or parchmentized fiber is secured to a felted body by cement, the kind not being mentioned.

Patent No. 957,064, to Charles R. Keeran, granted May 3, 1910, which is referred to only as showing the state of the art, shows an overall closure with a cushion of pulp board, over which is a layer of blotting paper saturated with sealing wax, rubber, or the like, and below that a disc of oil paper which does not overlap the bottle lip.

The prior art shows that many inventors had the idea of a spotting material coated in some manner with an adhesive.

It is true that none of them had the exact combination of Warth, but the use of paper or metal for spots, with gutta percha as the adhesive, although not coated on the same strip, was known and had been in use by plaintiff as early as 1917.

McManus, as early as November 17, 1915, the filing date of his patent in suit No. 1,339,066, had disclosed the use of a

fusible binding material in the place of a water-soluble adhesive or a heat-set adhesive, and it does not seem to me that with this teaching and the knowledge that was possessed by the art, there was any invention in selecting gutta percha or duPont 4620 as an adhesive, and coating the strip therewith, but that it was a mere substitution of material, made when it became desirable to put into use commercially the McManus cap, using the fusible binding material. This finding renders unnecessary any extended consideration of the questions raised by the defendant as to filing dates and the Lange interference proceeding, and also as to whether the defendant has established its defense of prior use in 1925; but in any event, it was established that defendant, in 1925, manufactured about 300,000 center spot crowns for the Inecto Company, using for the material from which the center spot was cut strips on which gutta percha and tinfoil were mounted together; and although the defendant abandoned its experiment, and whether it can be or cannot be considered as an anticipation, as to the spotting strip alone, it does show that the use of gutta percha and metal for spotting strips was known to the art.

The claims in suit of the Warth patent No. 1,899,782 do not show novelty or invention and are invalid.

The third patent in suit is Warth patent No. 1,899,783, of which claim 4, reading as follows, is the only one in issue:

Claim 4: "4. A bottle closure comprising a metallic shell, a cushion disc in said shell, a facing disc of hard, high-gloss paper having a varnished outer surface, said disc being of smaller diameter than and concentric with said cushion disc, and a stratum of gutta percha coextensive in area with the facing disc between the latter and the cushion disc and adhesively uniting the two discs."

This patent relates to bottle caps and the method of manufacturing the same, but claim 4 in suit relates only to the bottle cap and not to the method.

In his specification Warth describes at length what had preceded it, and then what he has done to overcome the difficulties.

He describes as the center spot material he uses (commencing p. 3, 1. 33) a tough paper having a hard or high-gloss finish, for example, such as termed a water-finish "which will not fracture, has an inherent resistance to liquids and gases,

and serves as an excellent carrier for an exposed or outer facing of varnish and for a backing layer of water insoluble, heat-fusible, and acid and gas-resistant adhesive."

For his hard high-gloss paper he recommends "express paper, sulphite paper or bleached kraft paper having a water-finish, i. e., high-gloss finish" (p. 3, 1. 75).

He uses a varnish which consists of "resin, China-wood oil and a drier," and containing a plasticizer (p. 4, 1. 113), and for his adhesive gutta percha (p. 3, 1. 111).

Warth says he began his investigation which led to this patent in suit in 1920, and that he did considerable experimenting.

The defendant offered in evidence the following alleged prior art, the showing of which was not explained on the trial, but they have been discussed by counsel for the respective parties in their briefs, and I will briefly consider the same.

Patent No. 1,339,066, to Charles E. McManus, granted May 4, 1920, which is here in suit, shows the use of a fusible binding medium in a center spot cap with a disc, "made of a hard parchment paper, or of any other paper so treated as to make it non-absorbent."

Patent No. 983,319, to Eugene C. Smith and Victor E. Smith, granted February 7, 1911, shows an overall seal in which a piece of Manila paper 3 was held to the pad by a water-soluble adhesive made up of glue, glycerine, and sugar, with the outer coating of Manila paper covered with a celluloid varnish.

Patent No. 1,238,156, to Reinhold Gustav Koch, granted August 28, 1917, shows an "overall" covering for a cork disc, the material next to the bottle contents being the metal foil F. The foil is adhered to a sheet of paper by vulcanized rubber and the paper, in turn, is held to the cork by gutta percha.

Patent No. 1,215,737, to George Emil Stahl, granted February 13, 1917, shows an overall closure. Next to the beverage was tissue paper, which was held to a jute stock paper layer by gutta percha with a couple of layers above it. It does not seem to me that this cap could be used for beer as Stahl thought, because its overall character would prevent it from holding high pressure beverages, and the tissue paper, if used for acidulated beverages, would be readily penetrated by the moisture.

Patent No. 1,779,884, to Louvern G. Lange, granted October 28, 1930. This patent does not show a paper spot crown of the Warth construction, and is not prior art to this patent in suit.

Patent No. 671,191, to Edward W. Hanauer, granted April 2, 1901, shows the use of gutta percha to fasten the turned-up bottom of trousers to the trousers leg.

Patent No. 957,064, to Charles R. Keeran, granted May 3, 1910, shows an overall closure of the "Mason jar" type, consisting of a piece of oil paper 9, which does not overlap the lip of a bottle, and is in contact with the contents of the bottle. It is adhered to a layer of blotting paper 8, by sealing wax, rubber, or the like, and above but not adhered to it is a cushion disc 7, of soft pulp board.

Patent No. 408,177, to Daniel W. Johnson, granted July 30, 1889, shows a closure of the "Mason jar" type, with a "scaling gasket" of "parchment or parchmentized fiber," secured to a "felted body" by being cemented in any suitable manner. This is not a paper spot crown.

Center spot crowns were not new with Warth but were known to the art for years before any date of invention shown by Warth, as was also the use of composition cork discs. The use of paper for the center spot or a fusible binding medium were not new, as both had been disclosed by McManus in his patent No. 1,339,066.

From a consideration of the prior art, it seems to me that if there be invention in this patent, it must reside in the particular kind of facing material, and the particular kind of binder; but in view of the teaching of the prior art, especially of McManus No. 1,339,066, there was no invention over McManus No. 1,339,066 or the prior art in selecting a facing disc of hard high-gloss paper or gutta percha as the adhesive, but all that Warth accomplished by his patent in suit, No. 1,899,783, resulted from a mere substitution of material when the plaintiff desired to commercially produce the heat-fusible caps suggested by McManus.

Warth patent in suit No. 1,899,783 shows no novelty or invention and is invalid.

The fourth patent in suit is reissue patent No. 19,117, to Albin H. Warth, granted March 20, 1934, and discloses a process of producing closures, of which claims 1 and 3, reading as follows, are in suit:

Claim 1: "1. The improved method of manufacturing caps of the type having an interior disc of cushion material provided on its exposed face with a center spot, which comprises providing spot material in strip form having one surface formed of an exposed continuous coating of water resistant adhesive which is normally hard at room temperature but becomes tacky upon the application of heat and having another surface to be exposed to the contents of a capped container, cutting from said strip a facing spot having one surface completely coated with said adhesive with a cap disposed beneath the portion of the strip from which the spot is cut, whereby the cutting operation positions the spot upon the cushion material with the coating between the spot and the cushion material, and upon assembly applying simultaneously to the spot pressure and sufficient heat to render the adhesive tacky, thereby causing the spot to adhere to the cushion material, and thereafter permitting the adhesive to cool and harden."

Claim 3: "3. The improved method of manufacturing caps of the type having an interior disc of cushion material provided on its exposed face with a center spot, which comprises providing spot material in strip form having one surface formed of an exposed continuous coating of water resistant adhesive which is normally hard at room temperature but becomes tacky upon the application of heat and having another surface to be exposed to the contents of a capped container, cutting from said strip a facing spot having one surface completely coated with said adhesive with a cap disposed beneath the portion of the strip from which the spot is cut, whereby the cutting operation positions the spot upon the cushion material with the coating between the spot and the cushion material, and upon assembly applying simultaneously to the spot pressure and sufficient heat to render the adhesive tacky, thereby causing the spot to adhere to the cushion material and thereafter permitting the adhesive to cool and harden while subjecting the assembled unit to pressure."

This patent is for a method which is described as follows:

Warth supplies a strip of thermoplastically-coated facing material, such as metal foil or paper coated with gutta percha to a punch which co-operates with a die. A

line of assembled crowns (that is, crowns having the metal shell and the cork disc therein) is fed step by step beneath this die. With the assembled crowns at rest beneath the die, the plunger descends, cuts a center spot from the strip of facing material, and presses it down against the cork with the adhesive in contact with the cork. In his illustrative drawings, Warth has shown heat applied to the cutting plunger. This warmed plunger supplies sufficient heat to the center spot to make the thermoplastic tacky when it is pressed against the cork. Then the cutting plunger rises and the crown, with the center spot stuck on it, moved to the next position, where it is subjected again to pressure from a heated plunger. Then this plunger rises and the crown moves on to the fifth step, where a cold plunger under pressure is applied to the spot, the pressure being maintained for a considerable time while the adhesive is cooling.

This method has great advantages over the plaintiff's first or slide machine, which operated about 50 or 60 strokes a minute, and has enabled plaintiff to design machines which successfully spot 500 per minute from each unit.

Although not satisfactory, plaintiff continued to use the slide machines for a period of about eight years, until a new machine, based on ideas furnished by Warth, working on a different method, was designed, built, and put in operation.

The defendant offered in evidence the following alleged prior art, which was not explained on the trial but has been discussed in the briefs on behalf of the respective parties:

Patent No. 1,339,066, to Charles E. McManus, one of the patents in suit, granted May 4, 1920, disclosed the fundamental idea of utilizing a thermoplastic for adhering the center spot to the crown, but did not show a machine or a method for applying the spots at any satisfactory commercial rate of speed.

Patent No. 1,213,926, to Charles E. McManus, granted January 30, 1917, shows merely a strip of facing material for making center spots. McManus proposed to provide his foil with a sheet of paper adhered to the foil by water glass, the other face of the paper being covered with a water soluble gum. The adhesive is not thermoplastic, and no method is shown by which the spots could be applied at a high rate of speed.

Patent No. 1,402,780, to Charles E. McManus, granted January 10, 1922, shows a bottle cap making machine. Such a machine was used to a very small extent in making spot crowns for nearly ten years. The strip material was coated with a water-soluble adhesive, the cork disc was dampened by a moistening dauber, and then the disc cut out of the strip material was pressed down on this wetted surface, in an attempt to cause it to adhere. According to the testimony of McManus, he could never get any speed out of such a machine because of the tendency of the spot to float on top of the crown before it could be adhered to it.

Patent No. 1,199,026, to John Alberti, granted September 19, 1916, and patent No. 1,401,300, to John Alberti granted December 27, 1921, the second patent being referred to only as showing the state of the art. The first of these patents shows a metal foil spot held to the cork by a heat-set adhesive albumen, and the second, the machine for applying it.

Patent No. 993,288, to Leonard Bartlett, granted May 23, 1911, shows a machine devised to make the so-called American type of center spot crown, in which a rubber ring-shaped gasket 20 is held in place by a cupped piece of aluminum 21, the flanges of which extend over the ring-gasket, and the center of which is pasted by some adhesive material to the metal shell itself. Bartlett refers to the adhesive material as "paste or other adhesive material," which is to be deposited in the shell and then the cupped piece of metal pressed down upon it.

Patent No. 1,603,786, to Melchor Marsa, granted October 19, 1926, referred to only as showing the state of the art, shows a method for adhering cork discs in the shells. A sheet of sheet metal is spotted with a resinous cement in the center, the shells are cut out with the resinous cement in the center, the disc is inserted in the shell, the cork disc 16 placed on it, and then the resinous cement is melted by a gas flame and subjected to pressure to cause the cork disc to adhere to the shell. Does not relate to center spot crowns.

Patent No. 887,883, to William H. Wheeler, granted May 19, 1908, referred to only as showing the state of the art. It does not refer to the center spot crown, but shows a crown assembling machine in which the cork disc is adhered to the shell by means of collets of paraffin paper.

Patent No. 792,284, to William Painter, granted June 13, 1905, and patent No. 887,838, to William Painter, granted May 19, 1908, both of which patents are referred to only as showing the state of the art, show respectively the original crown cap and machine for making it. The cork disc is held in the shell by means of an adhesive placed on a paper collet placed between the cork and the shell, the adhesive being heated and then submitted to pressure to cause the disc to adhere to the shell. Neither patent relates to center spot crowns.

An examination of the prior art patents, it is true, shows some suggestions in one patent and some in another, of some of the elements of the Warth invention, such as the idea of coating a strip with an adhesive, but not one that was thermoplastic, the idea of cutting out a disc and applying it to a cork, but none of them disclosed the Warth method. To none, whatever was the teaching of the prior art, did it suggest the possibility of a method such as Warth's, which could be used to produce center spot crowns in such commercial quantities, at a very high speed, which is an important consideration in crown cap production. International Cork Co. v. New Process Cork Co. (C.C.A.) 6 F.(2d) 420.

It is quite possible to carry out the Warth method by the use of a plunger, to which the heat is directly applied, although in that case there must be careful control of the heat in order to prevent the punch from becoming so hot as to cause a gumming of the punch itself from the tacky adhesive, or so cold as to supply insufficient heat to cause the spot to adhere.

Warth disclosed his method and it was unnecessary for him to show any apparatus for carrying it out. He was not limited to the particular form of apparatus illustrated as being useful for carrying out his method. It is sufficient that it has been shown that his illustrative apparatus is wholly operative, even if it was not the best which could be devised for commercial operation.

The Warth method has had large commercial success.

Men skilled in the art had long sought by various methods to accomplish what Warth teaches, and the fact that he succeeded where they failed is an evidence of invention, and the fact that parts of his method were old does not negative invention, as by the use of all the elements of

his method he produces a new result in a different way.

Defendant in addition to the prior art patents relies upon the alleged prior use by the defendant and the alleged prior use by the plaintiff to limit or invalidate the patents.

Without going into any extended description of the method the defendant contends it used in making the center spot caps for the Inecto Company, whatever it did was a temporary makeshift, which was abandoned as soon as it was able to perfect the making of the White Rock crown.

The only element of which it was able to present other than purely oral testimony, based solely on recollection, was that it obtained rolls of tinfoil and had surgical tissue combined with this foil. Defendant did not produce the machine nor any of the spot crowns which it claims that it used and made, and neither such machine nor spot crowns are in existence. No such machine was reproduced and proof offered that the operation which it described was possible. No drawings or other contemporaneous documentary proof was offered as to the method which was carried out by the machine, or as to the construction of the machine itself. The evidence offered as to the attachment made by Nagy for defendant, having a die for cutting center spots, is immaterial to the issue, as that attachment was made for the White Rock type of crown, and defendant's contention that it was changed by defendant itself, to adapt it to the making of the spot caps for the Inecto Company, is not supported by any documentary evidence. The testimony of Benno Cohn, secretary of the defendant, and Charles H. Rasmussen, superintendent of the defendant, given ten years after the alleged event, and based entirely on recollection, is the proof on which defendant relies as to the alleged method.

The remaining officers and employees of defendant called were Jay Bernard Eisen, who did not enter the defendant's employ until after the alleged making of the crowns in question, Jesse Gutmann, vice president and sales manager, who knew nothing as to manufacture and production of the alleged Inecto crowns, but did negotiate the sale of the center spots to the Inecto Company, Ferdinand Gutmann, president of the defendant, who knew nothing of their production, and Samuel Cohn, treasurer of the defendant, who knew that the Inecto crowns were made and ap-

proved of the expenditures involved, but did not testify as to method. None of the defendant's mechanics were called, although it is claimed the changes to its mechanism were made by its own mechanics, nor were such mechanics named or the failure to call them explained, although superintendent Rasmussen was requested to look them up and said he would do so, and defendant had available its employees' time-book going back as far as 1921.

The fact that defendant has sufficiently proved the purchase of the tin foil strips in 1925 does not prove the method, nor does the fact that they were used in some manner prove that the Warth method was used, as there were many different ways in which the adhesive strip could have been used other than in the way described by the witnesses.

Without questioning in any way the belief of Cohn and Rasmussen in the truth of their testimony, it is too uncertain, based only on recollection of what is alleged to have happened ten years before, to furnish proof beyond reasonable doubt, to anticipate the Warth method patents in issue. And, in addition, we must not forget that even the alleged prior use was abandoned and not resorted to when three years later defendant began making spot crowns.

The evidence of plaintiff's expert Weisenburg corroborated by Wilbur, as to the reproduction of the machine described by Cohn, and the results obtained in following the method described by Cohn, as shown by the crowns offered in evidence, is quite convincing that it was not possible, with such a machine, to produce commercial spot crowns, which leads to the belief that Cohn and Rasmussen must unconsciously have made some error in their recollection after the long period of years.

Of course, in the limited time at Weisenburg's disposal during the trial, the tests were necessarily ex parte, but plaintiff offered to repeat the tests inter partes, which offer defendant ignored.

The defendant's excuses for abandoning its alleged prior use, without going into details, are not convincing, and the actions of the defendant when it decided to make the spot crowns in 1928, clearly stamp whatever it did in 1925 as an abandoned experiment. Further, the proofs as to the paraffin coating of the Inecto spot crowns lead me to the belief that there is some error as to the method which Cohn and Rasmussen described as that used in 1925.

The alleged prior use of plaintiff asserted by the defendant is that of plaintiff's first or slide machine, in which a strip of tin foil and a separate strip of gutta percha tissue were fed together beneath a cutting punch which punched out the two discs and deposited them in a cavity, in a movable slide. Then the slide moved horizontally to carry out the cutout discs beneath an electrically heated suction plunger which picked up the two discs out of the cavity in the slide. Then the slide again moved from beneath the punch back to its original position, and the heated plunger with the discs sucked against its face was moved downward to deposit the discs on the cork of an assembled crown, to stick the spot to the cork disc, the suction pressure being released at the same time and changed to blowing, to help remove the spot from the end of the heated punch. The pressure of this heated punch caused the gutta percha to stick to the cork and also to the foil spot. The finished crown was then ejected from the machine. The combination of steps defined in the Warth methods of the patents in suit are not found in the plaintiff's first or slide machine, and it does not anticipate.

Defendant contends that it does not infringe because in its machine heat is not applied directly to the punch. This contention appears to me to overlook the requirements of the claims.

Claims 1 and 3 each provide, "and upon assembly applying simultaneously to the spot pressure and sufficient heat to render the adhesive tacky thereby causing the spot to adhere to the cushion material."

It is true that the defendant, as does the plaintiff in commercial practice, instead of applying the heat directly to the punch as illustrated in the drawing of the Warth reissue patent No. 19,117 in suit preliminarily heats the cork disc.

Defendant's electrical preheating and post heating plungers are as close to the punch as is practicable and engage the cork disc at stations immediately preceding and following the punch station. The sole purpose of preheating the cork immediately in advance of the punch is to create heat, which will be available at the instant the spot is deposited, so that there will be provided the combined effect of heat and pressure. In the defendant's Johnson machines, the temperature of the punch, although heat is not directly applied, is as high as 140° (gutta percha abecomes tacky

at about 120°). While the heat in the punch is not sufficient alone to effect the desired stick, it enables the operation to be conducted with less heat being applied to the cork, which tends to blacken and become scorched when too much heat is applied.

The claims in suit are not limited to the application of heat directly to the punch, and they are not so limited by the drawing offered by Warth in the prosecution of his patent, simply for the purpose of illustrating a suitable means for effecting the simultaneous application of heat and pressure at the instant of depositing the spot.

The prior art did not, nor do I find anything in the records of the patent office actions which limit the claims in suit to producing in any particular way the heat which is utilized at the instant of assembly.

The defendant's contention that it was using a method involving the application of pressure to the caps in a cooling drum while the adhesive cools and hardens, at least as early as August 8, 1933, which was prior to the application for reissue, has no bearing on the validity of claim 1 which appeared in the original patent and was carried over into the reissue. It has no bearing on claim 3, which is like claim 1, except that it specifies the additional step of applying pressure while the adhesive is cooling and hardening. The application for reissue was filed as soon as it was discovered that the claims of the original patent did not specifically cover the "cooling under pressure" step, and even if defendant may have been using a process as defined in claim 3, including the cooling under pressure, prior to the date of application for reissue, such use does not anticipate claim 3.

Defendant infringed claim 1, carried over from the original patent, and since the reissue was filed to obtain more limited claims, acquired no intervening rights. Abercrombie & Fitch Co. et al. v. Baldwin et al., 245 U.S. 198, 38 S.Ct. 104, 62 L.Ed. 240; Babcock & Wilcox Co. v. Springfield Boiler Co. et al. (C.C.A.) 16 F.(2d) 964; Ball & Roller Bearing Co. v. F. C. Sanford Mfg. Co. (C.C.A.) 297 F. 163; Maitland v. Goetz Mfg. Co. (C.C.A.) 86 F. 124; Vortex Mfg. Co. et al. v. F. N. Burt Co., Limited (D.C.) 297 F. 513; Hawie Mfg. Co. v. Hatheway Mfg. Co. et al. (D.C.) 27 F.(2d) 937; Steiner &

Voegtly Hardware Co. v. Tabor Sash Co. (C.C.) 178 F. 831.

There was no laches in the application for the reissue which voided the claim. Motion Picture Patents Co. v. Laemmle (D.C.) 214 F. 787.

The question of the speed of the defendant's machines does not seem to me to be in any sense controlling. The defendant's Cohn and Johnson machines are different from plaintiff's but that machinery operates in accordance with the Warth method, and that defendant has not been able to equal plaintiff's high rate of production is no defense. Elyria Iron & Steel Co. v. Mohegan Tube Co. (C.C.A.) 7 F.(2d) 827, 830, 831; Waxham v. Smith & The Buckeye Incubator Company, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733.

Defendant also denies infringement because of the difference in amount of pressure which it uses on its post-heating plunger, or on its cutting punch, as compared with the pressure under which the spot is held while the adhesive is cooling. Defendant also attempts to distinguish from the Warth method when operating under the Cohn patent, in that it says, the cork disc has not been firmly adhered to the metal shell when the center spot is applied to the cork disc.

Neither the disclosure nor the claims of Warth limit the use of pressure solely at the cutting punch. Defendant applies heat and pressure to cause "the spot to adhere to the cushion material" or to "effect adhesion" to the cork before the plungers of the cooling drum are reached, and that constitutes infringement. The adhesion having been caused before the plungers of the cooling drum are reached, the pressure applied by the plungers is immaterial.

The Warth reissue patent, No. 19,117, as to the claims in suit is valid and infringed.

The fifth patent in suit is the Warth patent No. 1,956,481, of which claims 6 and 16, reading as follows, are in issue:

Claim 6: "6. In a cap which includes a metal shell, a cushion liner of cork, a center facing of metal foil of less diameter than the cushion liner positioned on the latter, and a stratum of heat-fusible adhesive interposed between the facing and liner and uniting the two, said stratum comprising a cellulose derivative adhesive and a modifying agent enhancing the adhesive characteristics of said derivative."

Claim 16: "16. In a cap which includes a metal shell, a cushion liner of cork, a center facing of metal foil, and a stratum of heat-fusible adhesive interposed between the facing and cork cushion and uniting the two, said stratum comprising a nitrocellulose adhesive and resin."

The patent is for a spot crown and liner material therefor, and the specification describes a center spot crown, in which the center spot is adhered to the cork disc by a suitable cellulose derivative, such as nitrocellulose, to which a modifying agent to enhance the adhesive characteristics of the cellulose derivative has been added, such modifying agent being a resin and preferably a synthetic resin.

The defendant offered in evidence the following alleged prior art patents, but did not explain them on the trial. They are discussed in the briefs of the respective parties.

Patent No. 1,199,026, to John Alberti, granted September 19, 1916, shows a closure with heat coagulated albumen adhesive.

Patent No. 1,339,066, to Charles E. McManus, granted May 4, 1920, shows bottle-closure with resin-thermoplastic adhesive.

Patent No. 1,710,453, to Maurice Valentine Hitt, granted April 23, 1929, shows a nitrocellulose coating composition and film made therefrom, which in addition to the nitrocellulose contains many solvents and plasticizers, and in some case resins are added. The composition is not thermoplastic. The fact that the Hitt patent number may be found on the cans in which 4620 is contained does not prove that the Hitt material is the same as 4620. While it may well be that 4620 may employ the invention of Hitt, it may, because of different proportions of the materials, or because different materials are used, be wholly unlike the composition of the Hitt patent for some purposes. This is the fact in so far as this case is concerned, as 4620 is a thermoplastic, and the material of the Hitt patent is not.

The article in the June or July, 1932, number of the duPont Magazine, extolling the virtues of 4620.

Patent No. 1,325,075, to Joseph J. Byers, granted December 16, 1919, shows a composite sheet stuck together with some cellulose derivative mixed with a nondrying vegetable oil, such as castor oil. The use of nitrocellulose alone as an adhesive

was known, and nitrocellulose as an adhesive was old, but it is not thermoplastic. The patentee on page 1, beginning at line 72, states that a cement may be prepared by dissolving some cellulose derivative in any suitable solvent, such as acetone and alcohol, and on page 3, lines 40 to 44, he also states that heat applied in conjunction with pressure will cause the substance to act as a permanent cement.

Patent No. 1,389,084, to Lawson B. Wilson, granted August 30, 1921, shows a plastic cement for repair or mending, comprising celluloid, acetone, and a phenol, to which Wilson suggests may be added certain softening agents, fillers, and pigments. Among the fillers suggested are shellac, gums, and resins of various kinds. It is true that if phenol were omitted, and if the proper kind of resin, and in the correct proportions to the nitrocellulose were used, Wilson would have a thermoplastic cement, but Wilson makes no suggestion of the thermoplasticity, and no suggestion of omitting phenol.

Reissue patent No. 16,803, to Edmund M. Flaherty, granted November 29, 1927, shows a low viscosity lacquer and film produced therefrom. This lacquer is not thermoplastic, and I do not see the relevancy of that patent.

Patent No. 1,554,033, to Ebenezer Emmet Reid, granted September 15, 1925, shows a cellulose composition, which is a combination of a cellulose derivative with a butyl phthalate. No proof was offered to show whether butyl phthalate is or is not a resin, but as Reid says one of the uses to which his material may be put is for varnishes, it cannot be a thermoplastic. A varnish which would become tacky at a low heat would be unusable.

Patent No. 983,319, to Eugene C. Smith and Victor E. Smith, granted February 7, 1911, shows an overall covering for a cork crown, the adhesive to be used being a water-soluble adhesive and not a thermoplastic, and consisting of glue, glycerine, and sugar or molasses.

The following patents to Albin M. Warth, all of which are referred to as showing the state of the art:

Patent No. 1,867,637, granted July 19, 1932, shows a closure and interior facing therefor, using a gutta percha or gum adhesive.

Patent No. 1,908,498, granted May 9, 1933, shows method of manufacturing liner

material for container closures, with a gutta percha adhesive.

Patent No. 1,788,260, granted January 6, 1931. This is the original reissue No. 19,117, and shows process of producing closures using gum adhesive mixed with vegetable oil.

The ordinary center spot cap disclosed in the patent in suit differs only from the old and well-known type of center spot cap, in that instead of being secured by dammar gum, gutta percha, albumen, or any desired adhesive specified in the prior art, it is secured by means of a cellulose derivative adhesive, or specifically, a cellulose derivative and a resin.

It seems to me that the nitrocellulose adhesive called for by claims 6 and 16 is disclosed in the prior art, particularly in Byers patent No. 1,325,075.

In any event, the adhesive disclosed is a thermoplastic heat-fusible material, and its use represents only a substitution of material over the prior art, and no invention.

· The contention of the plaintiff that Warth conceived the invention and reduced it to practice in the fall of 1926 is erroneous. Whatever those experiments were, they seem to have been abandoned, because on receipt of the first sample of duPont Company 4620, January, 1932, Warth began to experiment with it the same as did the defendant, with the result that defendant made commercial shipments in June and July, 1933, whereas plaintiff did not use 4620 commercially until June, 1934.

If Warth had invented and reduced to practice the nitrocellulose resin adhesive in 1926, it is difficult to believe that he would have, about three years thereafter, made the affidavit filed May 5, 1929, in the prosecution of serial No. 360,895, in which he claimed to have discovered the desirable properties of gutta percha as an adhesive for center spot caps, or made a duplicate of that affidavit on December 22, 1932, in serial No. 492,546, filed October 31, 1930. This last mentioned affidavit was not shown to Dr. Warth, but it appears in the certified copy of the file of No. 492,546, Exhibit A.

As 4620 is superior to gutta percha, and both of these affidavits were made after January, 1932, when Dr. Warth said they first received 4620, it seems quite clear to me that Dr. Warth had not invented and reduced to practice a cellulose derivative

adhesive in the fall of 1926, nor had he progressed very far with his experiments with 4620.

The testimony of Mr. McManus, president of the plaintiff, Mr. Weisenburg, plaintiff's engineer, and Mr. Wilbur, a chemist for plaintiff, is quite convincing, that Dr. Warth had not succeeded in 1930, and that Mr. Weisenburg and Mr. Wilbur were still working on nitrocellulose and resins in 1931. This is inconsistent with the plaintiff's claim of invention and reduction to practice by Warth in the fall of 1926.

Dr. Warth had been trying to obtain a suitable nitrocellulose adhesive from the duPont Company and had obtained several kinds of nitrocellulose adhesives from them.

Finally Mr. Foley, of the duPont Company, told Dr. Warth that the company had put out an adhesive, No. 4620, which he (Mr. Foley) thought would be suitable for Dr. Warth's purpose. Mr. Foley knew that Dr. Warth wanted such an adhesive for applying center spots to caps.

Both plaintiff and defendant are using the patented product of the duPont Company, and I am unable to find invention in the Warth patent in suit, No. 1,956,481.

The Warth patent No. 1,956,481, claims 6 and 16 in suit, is invalid for lack of invention.

The sixth patent in suit is the Warth patent No. 1,967,195, of which claims 1, 2, and 3, reading as follows, are in suit:

Claim 1: "1. The method of assembling linings for sealing pads in receptacle closure caps, consisting in providing caps with sealing pads therein and a web of lining material arranged with an adhesive surface non-viscous at normal temperature, heating the pads in the caps, and severing linings from the web of lining material and assembling the linings as they are severed from the web in the caps with the adhesive surface in contact with the heated pads to render the adhesive viscous and effect adhesion of the linings to the pads."

Claim 2: "2. The method of assembling linings for sealing pads in receptacle closure caps, consisting in providing caps with sealing pads therein and a web of lining material arranged with an adhesive surface non-viscous at normal temperature, heating the pads in the caps, severing linings from the web of lining material and

assembling the linings as they are severed from the web in the caps with the adhesive surface in contact with the heated pads to render the adhesive viscous and effect adhesion of the linings to the pads, and then placing the linings in the caps under heat and pressure to effect an intimate adhesion between the linings and pads."

Claim 3: "3. The method of assembling linings for sealing pads in receptacle closure caps, consisting in providing caps with sealing pads therein and a web of lining material arranged with an adhesive surface non-viscous at normal temperature, heating the pads in the caps, severing the linings from the web of lining material and assembling the linings as they are severed from the web in the caps with the adhesive surface in contact with the heated pads to render the adhesive viscous and effect adhesion of the linings to the pads, then placing the linings in the caps under heat and pressure to effect an intimate adhesion between the linings and pads, and then placing the linings assembled in the caps under pressure during the cooling thereof."

This patent discloses a method of manufacturing bottle caps.

The method claimed comprises punching the center spot from a strip of thermoplastically-coated material, applying such spot to the cork disc with heat, obtained by preheating the cork disc, and pressure, and then allowing the adhesive to cool with pressure applied to the spot.

This is the same method as that described and claimed in Warth reissue patent No. 19,117, which was a generic method patent, except that in the method of reissue patent No. 19,117, he left it to choice as to how the heat for the adhesive was to be obtained, whereas in patent No. 1,967,195 in suit, the specific patent, he included the additional limitation that the heat for the adhesive was to be obtained by preheating the cork disc.

The defendant offered in evidence the following alleged prior art patents, which were not explained on the trial, but were discussed in the briefs of the respective parties:

Patent No. 1,199,026, to John Alberti, granted September 19, 1916, shows a metal foil spot held to the cork by a heat-set adhesive albumen.

Patent No. 1,339,066, to Charles E. McManus; granted May 4, 1920, discloses the fundamental idea of utilizing a thermoplastic for adhering the center spot to the crown, but did not show a machine or a method for applying the spots at any satisfactory commercial rate of speed.

Patent No. 1,213,926, to Charles E. McManus, granted January 30, 1917, shows merely a strip of facing material for making center spots. McManus proposed to provide his foil with a sheet of paper adhered to the foil by water-glass, the other face of the paper being covered with a water-soluble gum. The adhesive is not thermoplastic, and no method is shown by which the spots could be applied at a high rate of speed.

Patent No. 1,402,780, to Charles E. McManus, granted January 10, 1922, shows a bottle cap making machine. Such a machine was used to a very small extent in making spot crowns, for nearly ten years. The strip material was coated with a water-soluble adhesive, the cork disc was dampened by a moistening dauber, and then the disc cut out of the strip material was pressed down on this wetted surface, in an attempt to cause it to adhere. According to the testimony of McManus, he could never get any speed out of such a machine, because of the tendency of the spot to float on top of the crown before it could be adhered to it.

Patent No. 993,288, to Leonard Bartlett, granted May 23, 1911, shows a machine devised to make the so-called American type of center spot crown, in which a rubber ring-shaped gasket 20 is held in place by a cupped piece of aluminum 21, the flanges of which extend over the ring-gasket, and the center of which is pasted by some adhesive material to the metal shell itself. Bartlett refers to the adhesive material as "paste or other adhesive material," which is deposited in the shell, and then the cupped piece of metal pressed down upon it.

Patent No. 1,852,578, to John A. Johnson, granted April 5, 1932, shows a method and apparatus for assembling linings in receptacle closure caps. The method claims of that patent, 28, 29, and 30, were copied into the second divisional application, serial No. 664,410, and the Warth-Johnson interference 66201 was declared, which resulted in an award of priority to Warth. This interference will be more fully discussed later.

Patents to Alexander Bogdanffy, No. 1,169,608, granted January 25, 1916; No.

1,053,565, granted February 18, 1913; and No. 1,053,898, granted February 18, 1913. Each shows a machine for making the standard nonspotted crown cap, the cork disc being adhered to the metal shell by a heat-fusible (usually resinous) adhesive. None of them called for the heating of the cork disc before the spot is applied thereto.

Patents to William Painter, No. 468,-226, granted February 2, 1892, No. 792,-284, granted June 13, 1905, and No. 887,-838, granted May 10, 1908; the last two referred to only as showing the state of the art. The first is for the original bottle-sealing device of Painter, and the two latter are for the original crown cork patents in which a heat-fusible adhesive was used to hold the cork disc to the shell.

Patent No. 1,401,300, to Emilio Alberti and John Alberti, granted December 27, 1921, referred to only as showing the state of the art, shows a machine for manufacturing closures for bottles and other receptacles. It does not teach the use of a thermoplastic adhesive, and did not suggest the application of heat to the cork before the spot is applied.

Patent No. 1,134,031, to Robert G. Clark, granted March 30, 1915, referred to only as showing the state of the art, shows bottle cap assembling machine, and has no bearing on any method of applying crown caps to corks.

Patent No. 887,883, to William H. Wheeler, granted May 19, 1908, referred to only as showing the state of the art, shows an assembling machine which has no relation to center spots.

As I have said when considering the prior art as to Warth reissue patent No. 19,117, and for the same reasons, the prior art does not suggest the possibility of a method such as Warth's, which could be used to produce center spot crowns in such commercial quantities, at very high speed.

It is unnecessary to repeat what I said with reference to the alleged prior uses by defendant and plaintiff, in my discussion of Warth reissue patent No. 19,117, or any other defenses, because whatever I then said, so far as it is applicable here, I reassert as though repeated here.

The parent Warth application resulting in his patent No. 1,788,260, and which later became reissue No. 19,117, was filed on January 7, 1927, serial No. 159,743. It contained in addition to the broad idea of using heat and pressure simultaneously with the deposit of the spot, the specific disclosure, as suitable procedure, the preheating step. It is true as contended by the defendant, the description of preheating which was originally contained in this application was canceled by amendment, on December 3, 1930, but it is also true that at the time this description of the "preheating" procedure was canceled, Warth had on file a divisional application, serial No. 494,201, which had been filed on November 7, 1930, prior to the date of cancellation of the descriptive matter from the parent case. From this divisional application, a second division, serial No. 664,410, was filed on April 4, 1933, containing precisely the three claims in suit and the patent issued, after an interference on this application. Therefore, Warth had in the patent office a complete disclosure of this preheating, from January 7, 1927, when the parent application was filed, until April 4, 1933, when the application resulting in Warth patent No. 1,967,195 in suit was filed. The subject-matter was not abandoned, as suggested by defendant, but was specifically reserved by continuous inclusion in the divisional application, and later in the second division. This has been approved and is the usual practice. Writer v. Kiwad (Cust.&Pat.App.) 63 F.(2d) 259.

Defendant urges as a defense that it purchased certain machines from Johnson in 1928, and that having used the machines, it is entitled to continue to do so, as well as to use additional machines which it purchased in 1933.

This brings us to a consideration of the Warth-Johnson Interference, No. 66,-201.

There was no delay in provoking the interference with Johnson.

Plaintiff discovered early in 1933 the Johnson patent No. 1,852,578, dated April 5, 1932, on an application filed November 26, 1929, and immediately provoked the interference by copying the claims of the patent.

Warth did not copy the claims in the first division, serial No. 494,201, filed November 7, 1930, but carved out of the same the second division for the interference.

There was no delay on the part of Warth after receiving notice of the Johnson patent.

After a preliminary motion, Warth's attorneys proceeded to take testimony and

subpœnaed Johnson as their first witness, and Johnson offered to settle.

A settlement was finally arrived at whereby Johnson assigned his patent No. 1,852,578 to plaintiff, and was given a license under his patent, and also under plaintiff's patent No. 1,788,260, to continue the manufacture of the machines for plaintiff's licensees.

Counsel for Johnson and Warth did not care to take the responsibility of deciding the question of priority between Warth and Johnson, therefore those instruments were placed in escrow pending final determination of the interference by the patent office, and the assignment remained in escrow until the patent office decided the question at final hearing.

The decision of the examiner of interferences was in favor of Warth.

Defendant contends that plaintiff should have made an election as between the Johnson patent and Warth application, after the license and assignment were executed, rather than permit the patent office to settle the question, and in support of that contention refers to rule 94 of the patent office rules of practice.

This contention was not sustained.

Plaintiff did not have the legal title entitling it to make such an election until the interference was decided by the patent office as the assignment was in escrow.

Notwithstanding that plaintiff was convinced that the claims properly belonged in the Warth application, it was not possible to make the election in favor of the Warth application, and plaintiff could pursue no other course.

The patent office was fully informed as to the situation.

Rule 94 did not apply as it required an election when two applications of common ownership are involved in an interference, but did not permit an election in favor of an application when it is involved in interference with a patent. Even if plaintiff had held the assignment, which it did not, it could not have made the election in favor of the application. Chillas v. Weisberg, 1928 Commissioner's Decisions, p. 24.

Defendant cites United Chromium v. General Motors Corporation (D.C.) 11 F. Supp. 694, but that case seems to me to be distinguishable, as in that case election was made in favor of the patentee by the applicant filing a concession of priority.

The decision of the patent office in an interference proceeding does not bind the court, but the question of priority of invention, when properly raised, may be litigated in an action, and assuming that plaintiff on the evidence was convinced that Warth was the first inventor, it could not properly concede priority to Johnson, and with the assignment in escrow, it did not then have legal title to the Johnson patent.

Johnson's claims were limited to the step of preheating the cork, and as late as October, 1928, Johnson had not manufactured a machine for practicing such a method. The earlier 1928 machines, sold to the Cuban concern in March, to Gutmann in July, and to Armstrong in May, had no preheater.

It appears to me that the only difference between these machines and the machine purchased by Gutmann in August, 1928, was the fact that a drum was applied to the latter machine, for permitting the crowns to cool under pressure.

Johnson did visit plaintiff's plant in the early part of 1928, and was taken by McManus into the spotting department, and during Johnson's visit there, McManus says there was some discussion of patents relating to the spotting machinery, and this is corroborated by Johnson's letter to the Armstrong Company, on April 24, 1928.

Although Johnson had been working since early in 1927, to perfect a machine, he had not discovered either the importance of cooling under pressure, or the advantage of preheating the cork immediately in advance of the cutting punch.

Warth's machines had been in use since 1926, drawings of the machines being in evidence. These drawings were for three machines to supplement the three identical Warth machines at that time in actual use, as shown by the January, 1927, appropriation for the three additional machines.

The preheating was disclosed in the Warth application filed January 7, 1927.

The defendant's two machines, purchased in July and August, 1928, did not have a preheater, and did not embody the method of the Warth patent, No. 1,967,195, in suit.

The decision of the patent office in the interference was in entire accord with the facts.

The fact that Johnson, in 1929, built some machines for the plaintiff on special

order for plaintiff's own use does not affect the validity of the Warth patents, and does not anticipate a divisional application. American Chain Co. v. Franklin New York Co. (D.C.) 34 F.(2d) 551–555.

There was no anticipation by defendant's 1928 use, whatever method it used.

Defendant purchased two machines from Johnson, in July and August, 1928, and it is not proved that its 1928 machines had a preheater; on the contrary, Johnson admitted that prior to October, 1928, he did not have preheaters on any machines, and there is no uncertainty on this point, as the letters (Exhibit 36) show that he was then "working on what we call preheaters of the cork."

Johnson it is true testified, on direct examination, that the 1928 machines were all "like" his patent No. 1,852,578, and repeated this testimony when he identified the list of a number of machines, but he evidently did not mean that they had a preheater, since on cross-examination he modified his testimony, when confronted by plaintiff with an actual photograph of March 1, 1928, Cuban machine, which he admitted had neither a drum nor a preheater. This machine, which Johnson said was exactly like the unsatisfactory machine shipped to the Armstrong Company, merely used two heating punches. Cohn admitted that the machine purchased by defendant, on July 17, 1928, was like the one shown in the photograph. The machine purchased by the defendant in August, 1928, had a drum, but there is no evidence that it had a preheater, and Johnson admits that it did not.

There is no evidence to show that the Johnson machines sold to others than plaintiff and identified on the list had a preheater, or what was their construction, aside from Johnson's statement, which he changed under cross-examination. There is no proof of the date of the Johnson Catalogue, and it is therefore without value. The machines purchased by defendant from Johnson, in 1928, had no preheater, and I am convinced that defendant made no further purchase from Johnson until 1933, therefore the defendant has not proved any use of the preheating method, to anticipate the filing date of the first divisional application, November 7, 1930, or the filing date of the second divisional application, April 4, 1933. Even if there was evidence of the use of the Johnson machines during these periods, such user would not anticipate. From 1927 to 1930, Warth was prosecuting his broad claims to the method. The claims were not directed during this period to the Warth specific preheating step. Such manner of proceeding has been approved. Hartford-Empire Co. v. Nivison-Weiskopf Co. (C. C.A.) 58 F.(2d) 701.

As soon as it came to Warth's attention that any one else was claiming the invention, he, being unaware of what methods others were using, and having no knowledge of defendant's using the preheating method, proceeded as the statutes permitted, and in accordance with the practice recognized by the patent office and the courts. Overland Co. v. Packard Co., 274 U.S. 417, 47 S.Ct. 672, 71 L.Ed. 1131.

In making the claims to the preheating step, Warth was covering what he had invented, without any intent to expand his disclosure to cover later methods which had come to his attention. This has been approved by the courts. Carson v. American Smelting & Refining Co. (C.C.A.) 4 F.(2d) 463, 470; Remington Cash Register Co. v. National Cash Register Co. (D. C.) 6 F.(2d) 585, 614; Overland Co. v. Packard Co., supra.

The case at bar is clearly distinguished on the facts from Westinghouse Electric & Manufacturing Co. v. Jeffrey-De Witt Insulator Co., supra, and Dwight & Lloyd Sintering Co. v. Greenawalt, supra. In the Westinghouse Case, there was no proof of special circumstances, and in the parent application the patentee had not claimed the invention of his delayed divisional application, either generically or specifically. In the Dwight & Lloyd Case, there had been open, notorious infringement for thirteen years, known to the plaintiff, who had been in interference proceedings with the defendant, and there were no special circumstances, as here, justifying the delay.

The contention of the defendant that if the Warth reissue patent No. 19,117 be interpreted to cover generically the step of preheating the pads, it anticipates the divisional Warth patent No. 1,967,195, is not sustained.

The claims in suit in the reissue patent No. 19,117 require "and upon assembly applying simultaneously to the spot pressure and sufficient heat to render the adhesive tacky."

The claims in suit in the divisional patent No. 1,967,195 require "heating the pads in the caps."

None of the claims of the divisional patent is readable upon the disclosure of the reissue, and therefore when the reissue patent expires, the public will be free to practice the method without infringing the divisional patent, that is, the public may employ any method of obtaining the heat at the instant of assembly except the specific "heating the pads in the caps" covered in the later patent.

The reissue patent is the generic and the divisional the specific patent, and therefore the reissue does not anticipate the divisional patent.

It does not seem to me that the result of the issuance of the divisional patent extends the monopoly of the Johnson patent. Johnson was not the first inventor of the method, and the patent could not afford a monopoly on the method.

There was no delay on the part of plaintiff when it first learned of the improper grant to Johnson, and to hold the patent invalid on that ground would be to penalize the plaintiff because of the inadvertent grant to another, who was not the original inventor.

In addition to what has been said with reference to Warth reissue patent No. 19,-117 as to infringement, which need not be repeated here, it is also true that the defendant does use the method of preheating as described in the claims in suit, of Warth patent No. 1,967,195.

The Warth patent No. 1,967,195 as to the claims in suit is valid and infringed.

This leaves for consideration only patent No. 1,921,808, issued to Benno Cohn, assignor to Ferdinand Gutmann & Co., granted August 8, 1933, pleaded by the defendant as a counterclaim. The defendant is the owner of this patent.

The patent is for a method. The empty shells are fed into the machine from a hopper, then heated, an adhesive placed in the metal shell, the cork disc inserted in the metal shell, and the caps are then carried to the spotting mechanism so that the cork (either natural or composition) liner is put in the shell and a center spot inserted, all in one machine.

There are three claims to the patent and all are in suit, but I need not quote them.

The reply pleaded a general denial, which raises only the issue of infringement.

The defendant's charge of infringement is predicated on the fact that the Crown Cap Manufacturing Company of Brooklyn sent a standard Johnson assembling machine to Nagy to have an attachment added, that would place center spots on the corks while the crown was being assembled, and that Nagy delivered such a machine to the Crown Cap Manufacturing Company early in 1933 or late in 1932.

In July, 1933, the Crown Cap Manufacturing Company sold its assets, including this machine, to plaintiff.

Defendant's witness Fries said that he could never get this machine to work so that it could produce commercially. Whether or not there was something wrong in the manner in which the Crown Cap Company attempted to operate this machine, as contended by defendant's counsel, Fries says that he never could fully determine what the difficulty was, otherwise he would have corrected it. It certainly was his intention to go on manufacturing in accordance with the method of this combined machine. I therefore believe that the machine would not work to produce commercially.

Fries remained in charge for four months after July, 1933, when the plaintiff took over the assets of the Crown Cap Manufacturing Company. During those four months this machine was never operated by the Crown Cap Manufacturing Company, by him or by any one in that plant.

This machine was sent to the Baltimore plant of plaintiff, it is still on the skids, has never been used by plaintiff, and has never been set up for operation.

There is no proof of any use of this machine by the plaintiff, and if the testimony of Fries be accepted, and I see no reason why it should not be, the machine would not work to produce commercially, therefore there is no proof of infringement.

McManus says that such a machine was never considered by him as having any value, because it was slow, and that there was no advantage in having the spotting machine connected to the assembling machine.

Taking all that has been said into consideration with the fact that if properly workable, which it was not, this machine, which was experimental, would have had a rate of production of about 200 a minute, as against plaintiff's machine which produces 500 a minute, the mere possession of this machine raises no inference even of a threat of infringement.

More than an inference is necessary to prove infringement, particularly of a method patent.

The plaintiff does not and has not infringed.

The defendant's counterclaim as to patent No. 1,921,808 is dismissed, on the ground of noninfringement.

A decree may be entered in accordance with this opinion, in favor of the plaintiff against the defendant on McManus patent No. 1,339,066; Warth reissue patent No. 19,117; and Warth patent No. 1,967,195; and dismissing the defendant's counterclaim on Cohn patent No. 1,921,808; with four-sevenths costs and disbursements; and in favor of the defendant against the plaintiff dismissing the bill of complaint on the merits as to Warth patent No. 1,899,782; Warth patent No. 1,899,783; and Warth patent No. 1,956,481; with three-sevenths costs and disbursements.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law, in accordance with this opinion, for the assistance of the court, as provided by rule 70½ of the Equity Rules (28 U.S.C.A. following section 723) and rule 11 of the Equity Rules of this court.